862 A.2d 453

TOMRAN, INC.

v.

William M. PASSANO, Jr., et al.

No. 101, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Dec. 3, 2004.

708

Cyril V. Smith (P. Andrew Torrez, Charles J. Piven, Marshall N. Perkins, on brief), Baltimore, for appellant.

Robert Mazur, New York City, Mark Gately (Michael D. Colglazier, Christine M. Hansen, Hogan & Hartson, LLP, on brief), Baltimore, for appellee.

Panel HOLLANDER, KENNEY, KRAUSER, JJ.

KENNEY, Judge.

Tomran, Inc. ("Tomran"), on behalf of Allied Irish Banks ("AIB"), filed a triple derivative action against appellees, the officers and directors of Allfirst Bank, a wholly owned subsidiary of Allfirst Financial, Inc. ("Allfirst Financial"), which is a wholly owned subsidiary of AIB. The suit was filed in the Circuit Court for Baltimore City, which dismissed it on three independent Irish law grounds. Tomran appeals that decision and presents three questions for our review, which we have slightly reworded:

I.    Did the trial court abuse its discretion in dismissing the complaint by refusing to honor the parties' contractual agreement to apply New York law to "all rights" of the parties, contrary to *Kronovet v. Lipchin*, 288 Md. 30, 415 A.2d 1096 (1980), and the *Restatement 2d of Conflict of Laws* § 187?

II.    Did the trial court err in dismissing the complaint on standing grounds by "refusing to predict the direction in which" a foreign court may rule, contrary to its obligation under Maryland Code (1974, 2002 Repl.Vol.) § 10–501 of the Courts and Judicial Proceedings Article ("CJ") to determine foreign law; and because authoritative evidence of Irish law, including a treatise on point authored by the Chief Justice

of the foreign court and settled English authority, demonstrated Tomran's standing?

III. Did the trial court abuse its discretion in refusing to follow the liberal amendment policy spelled out in Maryland Rule 2–322 and 2–341, to allow an amendment that would have cured any defect relied upon to dismiss the complaint, when the amendment would not have caused any prejudice to the defendants?

For the reasons stated below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

This case arises out of one of the banking scandals that plagued Allfirst Bank and earned the distinction of being the largest bank fraud in Maryland history. On February 6, 2002, Allfirst Bank announced that it had discovered that its foreign currency trader, John Rusnak, had committed fraud that ultimately caused Allfirst Bank to restate its earnings downward by almost $700 million. Tomran, a holder of American Depositary Receipts ("ADRs") of AIB stock worth over $100,000, made a demand on the boards of AIB and Allfirst Bank. AIB is an Irish corporation publicly traded on the New York Stock Exchange. AIB owned 100% of Allfirst Financial. Allfirst Financial is a Delaware Corporation with its principal place of business in Baltimore. Allfirst Financial is a bank holding company, which was the sole owner of various subsidiaries, including Allfirst Bank. Allfirst Bank, a financial institution with its principal place of business in Baltimore, is registered on the books of the Commissioner of Financial Regulation pursuant to Maryland Code (1980, 2003 Repl.) § 1–101 of the Financial Institutions Article ("FI"). On April 1, 2003, AIB announced the sale of all of its interest in Allfirst Financial to M & T Bank Corporation, a New York corporation.

Unsatisfied with their denial of his demand, on May 13, 2002, Tomran filed a derivative suit for money damages and declaratory and injunctive relief against the directors and

senior officers of Allfirst Bank and nominal defendants, AIB, Allfirst Bank, and Allfirst Financial.[1] On August 14, 2002, Tomran amended its complaint to read as a "triple derivative" action.[2]

The amended complaint alleged that appellees were negligent and grossly negligent in their oversight of Rusnak, which

---

1. Those directors and officers are William M. Passano, Jr.; Frank P. Bramble; Susan C. Keating; David M. Cronin; Sherry F. Bellamy; James T. Brady; Jeremiah E. Casey; Edward A. Crooke; John F. Dealy; William T. Kirchhoff; Henry J. Knott, Jr.; Andrew Maier, II; Morton I. Rapoport; Michael J. Sullivan and Rhoda M. Dorsey. All of the financial institutions and the officers and directors, with the exception of David M. Cronin, joined in a single brief.

   In this opinion the phrase "officers and directors" shall refer to all of the officers and directors. If relevant to our discussion, Cronin will be identified individually.

   Two of the named directors and officers have served on Allfirst Bank's Board and AIB's Board. According to the amended complaint, Frank P. Bramble "previously served on the Bank's and AIB's Boards of Directors ... and served as Chief Executive of the Bank," and Jeremiah E. Casey served as a director of the Bank and as a director of AIB. The amended complaint also alleges that

   > [t]he present directors of AIB and its senior executive officers include many of the same individuals who are also either [directors and officers], or appointees to the Allfirst Financial and Bank boards, or former members of the Allfirst Financial board who are culpable for the Bank's losses. . . . AIB's present directors and senior management share culpability for the Bank's enormous losses. These individuals breached their duties to AIB, and these breaches were a proximate cause of the Bank's and AIB's consequent losses."

2. In its amended complaint, Tomran stated that "[i]t is a triple derivative action because the claims for money damages are brought for the benefit of Allfirst Bank—and, indirectly, for the benefit of its parent companies, nominal defendants Allfirst Financial and [AIB]—against certain of Allfirst Bank's directors and officers, and no claims of wrongdoing or liability are asserted against Allfirst Bank or the other nominal corporate defendants." When M & T Bank Corporation acquired Allfirst Financial, this action became a single derivative suit on behalf of AIB. As explained by the officers and directors in a letter to the circuit court, "the merger agreement does absolutely nothing to interfere with this action. To the precise contrary, it expressly provides for the assignment of Allfirst Financial's and Allfirst Bank's Rusnak-related claims against the individual defendants to AIB. . . . Accordingly, if the merger is approved, and if this action still exists, the action's multiple derivative nature will be obviated." On April 1, 2003, AIB announced that it sold all of its interest in Allfirst Financial to M & T Bank Corporation.

resulted in the loss to Allfirst Bank.[3] The amended complaint also sought a declaratory judgment and injunction regarding Allfirst Bank's changing of its charter in December 1998 from that of a national banking association to a Maryland charter. In its amended complaint, Tomran contended that, as a result of the change in the charter, the officers and directors of Allfirst Bank were no longer " 'personally liable to the Bank or its shareholders for money damages.' " [4] This, they contend, makes the charter change an interested director transaction that "conferred a very substantial personal benefit upon the officers and directors of the Bank, including the officers and directors who participated in the purported transfer of the Bank's charter and in the purported entry into force of the new articles of incorporation[.]" Tomran sought a declaration

---

3. As a derivative shareholder action, any recovery would go directly to AIB.

4. Allfirst Bank changed its charter from a national banking association to a commercial bank pursuant to Title 3 of the FI Article of the Maryland Code (1980, 2003 Repl.Vol.). Pertinent to Tomran's complaint, Article IX of the charter reads:

To the fullest extent permitted by Maryland law, as amended or interpreted, no director or officer of the Bank shall be personally liable to the Bank or its shareholders for money damages. No amendment of these Articles of Incorporation or repeal of any of the provisions hereof shall limit or eliminate the benefits provided to directors or officers under this Article IX with respect to any act or omission which occurred prior to such amendment or repeal.

Maryland Code (1975, 1999 Repl.Vol.) § 2–405.2 of the Corporations and Associations Article provides for limited director and officer liability. It states: "The charter of the corporation may include any provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders as described under § 5–418 of the Courts and Judicial Proceedings Article." CJ § 5–418 provides that a charter may "limit[ ] the liability of its directors and officers ... for money damages," but it excludes recovery under two circumstances:

(1) To the extent that it is proved that the person actually received an improper benefit or profit in money, property, or services for the amount of the benefit or profit in money, property, or services actually received;

(2) To the extent that a judgment or other final adjudication adverse to the person is entered in a proceeding based on a finding in the proceeding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding[.]

"confirming that the change in the Bank's articles was not retroactive and did not cover the $40 million in losses already in place as of December 1998." It also sought to enjoin the appellees "from asserting that their liability to the Bank [was] limited in any fashion by the December 1998 transaction."

All the officers and directors of the Bank filed motions to dismiss on the following grounds: that Tomran had failed to state a claim upon which relief could be granted; that Maryland courts did not have the authority to address this case; that Tomran did not have standing to sue; and that Allfirst's charter barred Tomran's claims.[5] At the hearing on the motions to dismiss, two Irish barristers, through affidavits and depositions, advised the court as experts on Irish company law. Both experts, Michael Ashe for the appellees and Eion McCullough for the appellants, agreed that shareholder derivative suits are rare in Ireland, and that the case would turn on whether English common law "is relevant to commercial life and practice."

In its order and opinion, dated December 30, 2002, the circuit court determined that the complaint failed to state a claim upon which relief could be granted. In rendering its decision, the circuit court, in reference to subject matter jurisdiction, stated that it was "not prepared to say that a Maryland court is required to abstain from exercising jurisdiction over the internal affairs of AIB, even if that entails the application of foreign law to the rights and duties of the parties."

The circuit court also determined that Irish law should apply "in determining the sustainability of [Tomran's] claims in this case." The court explained that,

where the Court has held that the internal affairs doctrine does not pose a complete bar to its exercise of jurisdiction over the internal affairs of a foreign corporation, it is unwilling to go farther and ignore the well settled principles that underlie that doctrine and require that the law of the

---

5. The court stayed all discovery pending resolution of the motions.

place of incorporation govern the rights and responsibilities of the parties with respect to its internal operations.

The court found that Tomran, to maintain the action, needed to establish: (1) that it is entitled, "as a beneficial owner of AIB shares rather than a registered shareholder," to bring a derivative suit against AIB; (2) that the amended complaint "set forth allegations sufficient to constitute a 'fraud on the minority' exception to the rule in the case of *Foss v. Harbottle*, 2 Hare 461 (1843), which stands for the general proposition under Irish law that even registered shareholders may not maintain an action on behalf of the company" [6]; and (3) that "Irish law would permit a triple derivative action." [7]

As to the first, because no Irish case has permitted a beneficial owner of shares to maintain a derivative action, it concluded that Tomran lacked standing to sue. As to the second, the court found that "it was unlikely that the bald allegations contained in . . . the first amended complaint would satisfy an Irish court that the 'fraud on the minority' exception . . . has been pled adequately[.]" As to the third, the court found no authority to suggest that "Ireland is about to permit double or triple derivative actions by even registered shareholders." Consequently, the circuit court concluded that Tomran's request for a declaratory judgment and injunction was "rendered moot by the Court's determination that [Tomran] lacks standing to bring this action."

---

6. Generally, in Ireland, it is within the discretion of a corporation to bring a suit on its own behalf. *Foss v. Harbottle*, 2 Hare 461 (1843). Nevertheless, there are narrow exceptions, one of which is referred to as the "fraud on the minority exception," which permit a derivative suit when the plaintiff sufficiently pleads that "a majority who are in control of a company" perpetrate a fraud on the minority of the company. *See The Honorable Mr. Justice Ronan Keane Chief Justice of Ireland, Company Law*, 310 (Butterworths 3d ed.2000). The experts agree that it is the only exception to be considered in this case.

7. When the circuit court held the hearing on the motion to dismiss, AIB had announced a proposed merger and acquisition of Allfirst Financial by M & T Bank Corporation, but the merger had not been approved. *See supra* note 1, at 2.

Tomran filed a motion to amend the complaint and two motions requesting the court to alter or amend its judgment. After the court denied all of the post-hearing motions, Tomran noted this timely appeal.

## STANDARD OF REVIEW

We review *de novo* a trial court's grant of a motion to dismiss, considering whether the court was legally correct. *Adamson v. Corr. Med. Servs. Inc.*, 359 Md. 238, 246, 753 A.2d 501 (2000); *Phillips Way, Inc. v. Presidential Fin. Corp.*, 137 Md.App. 209, 212, 768 A.2d 94 (2001) (citing *State v. Jones*, 103 Md.App. 548, 606, 653 A.2d 1040 (1995)). In so doing, "we must assume the truth of the well-pleaded factual allegations of the complaint, including the reasonable inferences that may be drawn from those allegations." *Adamson*, 359 Md. at 246, 753 A.2d 501; *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 555, 731 A.2d 957 (1999); *Stone v. Chicago Title Ins. Co.*, 330 Md. 329, 333, 624 A.2d 496 (1993); *Tafflin v. Levitt*, 92 Md.App. 375, 379, 608 A.2d 817 (1992).

In reviewing the trial court's denial of Tomran's motions for leave to amend, an abuse of discretion standard applies. *Walls v. Bank of Glen Burnie*, 135 Md.App. 229, 236, 762 A.2d 151 (2000); *Wormwood v. Batching Systems, Inc.*, 124 Md. App. 695, 700, 723 A.2d 568 (1999).

## DISCUSSION

### I. American Depositary Receipts ("ADRs")

For a general understanding of ADRs, we quote at length from *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361 (3rd Cir.2002).

An ADR is a receipt that is issued by a depositary bank that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depositary, known as the custodian. The holder of an ADR is not the title owner of the underlying shares; the title owner of the underlying shares is either the depositary, the

custodian, or their agent. ADRs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the Securities Act and the Exchange Act. This makes trading an ADR simpler and more secure for American investors than trading in the underlying security in the foreign market.

ADRs may be either sponsored or unsponsored. An unsponsored ADR is established with little or no involvement of the issuer of the underlying security. A sponsored ADR, in contrast, is established with the active participation of the issuer of the underlying security. An issuer who sponsors an ADR enters into an agreement with the depositary bank and the ADR owners. The agreement establishes the terms of the ADRs and the rights and obligations of the parties, such as ADR holders' voting rights.

*Id.* at 367 (citations omitted).

## II. Jurisdiction

■ The first question to be considered is jurisdiction. The officers and directors argue that the internal affairs doctrine prohibits Maryland courts from interfering with the internal affairs of a foreign corporation and acts as a jurisdictional bar. Tomran posits that the internal affairs doctrine has evolved and is now recognized as a choice of law doctrine that does not necessarily preclude jurisdiction.

Generally, "[w]ith regard to foreign corporations, Maryland courts have traditionally declined to interfere in management disputes under the 'internal affairs doctrine.'" *NAACP v. Golding,* 342 Md. 663, 673, 679 A.2d 554 (1996) (citations omitted).[8] In *Golding,* the Court of Appeals explained:

---

8. Victoria A. Braucher and Judith O'Gallagher in *Fletcher Cyclopedia of the Law of Private Corporations,* Vol. 17, § 8444 (1998 Rev. Vol.) (footnotes omitted) explain:

It is the general rule that a court will not take jurisdiction of a suit by a shareholder for an accounting or other equitable relief against a foreign corporation where the relief sought requires the court to exer-

Our courts ... can enforce no forfeiture of charter for violation of law, or removal of officers for misconduct; nor can they exercise authority over the corporate functions, the by-laws, nor the relations between the corporation and its members, arising out of, and depending upon, the law of its creation. These powers belong only to the State which created the corporation.

*Id.* at 674, 679 A.2d 554 (quoting *Condon v. Mutual Reserve Fund Life Ass'n*, 89 Md. 99, 116–17, 42 A. 944 (1899)).

The officers and directors rely heavily on *NAACP v. Golding* to support their argument that the internal affairs doctrine is in "full force today" and precludes jurisdiction by a Maryland court over the case. In *Golding*, the circuit court, upon request by certain youth members, enjoined an election of the NAACP. Those members protested the organization's rule that only youth paying the higher adult membership fee would be allowed to vote. In reversing the decision, the Court of Appeals concluded that the court should not have intervened "in the internal affairs of a voluntary membership organization." *Id.* at 672, 679 A.2d 554.

In this case, the circuit court determined that the "internal affairs doctrine is alive and well in Maryland," but that *Golding* did not require the court "to abstain from exercising jurisdiction." The court distinguished the holding in *Golding* "because it turns on both the limited circumstances under which a court should address the disputes of voluntary mem-

---

cise visitorial powers or interfere with the internal affairs or management of the corporation.

\* \* \*

However, it is well established that courts generally will entertain jurisdiction of a suit by a shareholder against a foreign corporation and its directors, officers or agents to prevent or redress misappropriation, diversion or waste of corporate property or assets or corporate mismanagement by directors, officers or agents, especially where the suit is, in effect, for the benefit of the corporation itself. In such case the shareholder is seeking to enforce in favor of the corporation exactly the same rights that it might enforce for itself, and since it could maintain suit against such directors, officers or agents wherever they could be found, the stockholder is permitted to maintain a like suit, where that shareholder cannot obtain relief through the corporation.

bership organizations, particularly where there is no economic interest at stake, and on the failure of the youth members to exhaust their internal remedies." Quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Court of Appeals in *Golding* stated:

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.

*Golding*, 342 Md. at 673, 679 A.2d 554.

Thus, if the internal affairs doctrine is indeed a conflict of laws principle rather than an automatic bar to jurisdiction, as the Court in *Golding* indicated, a *forum non conveniens* analysis is appropriate. *See Restatement (Second) of Conflicts of Laws* § 313 (stating that "[a] court will exercise jurisdiction over an action involving the internal affairs of a foreign corporation unless it is an inappropriate or an inconvenient forum for the trial of the action"); CJ § 6–104 (stating that, "[i]f a court finds that in the interest of substantial justice an action should be heard in another forum, the court may stay or dismiss the action in whole or in part on any conditions it considers just"); *Jones v. Prince George's County*, 378 Md. 98, 120–21, 835 A.2d 632 (2003) (citations omitted) (stating that "[a] court must weigh in the balance the convenience of witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.' ").

In this case, the alleged fraud occurred in Maryland; the nominal defendant, Allfirst Bank, is chartered in Maryland; and it is alleged that "the evidence and witnesses related to the claims are principally located in Maryland, as are most of the defendants." Thus, we are not persuaded that Maryland is an inconvenient forum for the trial of the action or that the Maryland courts are necessarily without jurisdiction.

### III. Choice of Law

■ But, if there is jurisdiction, what law should apply? Tomran argues that the trial court erred in refusing to apply New York law pursuant to the choice of law clause in the Deposit Agreement between Tomran and AIB when Tomran purchased 4,800 AIB ADRs. Section 7.6 of the Deposit Agreement states: "[T]his Deposit Agreement and the Receipts [ADR] shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York." Tomran argues that this clause clearly dictates that "New York law applies *not only* to interpretation of the Receipts and the Deposit Agreement, but also to *all rights* arising from those documents." (Footnote omitted.)

Tomran directs us to *Batchelder v. Kawamoto,* 147 F.3d 915 (9th Cir.1998), *cert. denied,* 525 U.S. 982, 119 S.Ct. 446, 142 L.Ed.2d 400 (1998), in which the Court considered a choice of law question pursuant to a Deposit Agreement that included similar language to Section 7.6. The relevant portion stated:

> [T]his Deposit Agreement and the [American Depositary] Receipts and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by and construed in accordance with the laws of the State of New York, United States of America. It is understood that notwithstanding any present or future provision of the laws of the State of New York, *the rights of holders of Stock and other Deposited Securities, and the duties and obligations of the Company in respect of such holders, as such, shall be governed by the laws of Japan.* ( [E]mphasis added).

*Id.* at 918. The Court of Appeals for the Ninth Circuit indicated that the second sentence of this passage required the application of Japanese law to matters involving shareholder rights and the corporation's duties to the shareholders, including the holders of deposited securities.

■ Tomran argues that, *"but for the existence of the second sentence"* in the *Batchelder* Deposit Agreement, the court would have applied New York law. Therefore, because

there was no language similar to the "second sentence" in the current case clarifying the rights of deposit holders, Section 7.6 governs the choice of law question and provides that New York law should apply.[9] Tomran further explains that Maryland courts, for more than two decades, have required the enforcement of choice of law provisions in contracts. The *Restatement (Second) of Conflict of Laws* § 187 (1971), which has been adopted by Maryland, provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed on that issue." There are two exceptions:

"a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice or

b) the application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

*Kronovet v. Lipchin,* 288 Md. 30, 44–45, 415 A.2d 1096 (1980) (quoting *Restatement (Second) of Conflict of Laws* § 187 (1971)).

The officers and directors argue that "the Deposit Agreement, including its choice-of-law provision, [is] inapplicable to issues concerning AIB's internal affairs." They contend that the Deposit Agreement only governs the mechanics of the ADR program, including, for example, the form and transferability of receipts, cancellation and destruction of surrendered receipts, and execution and delivery of receipts.

The Deposit Agreement does not address AIB's internal structure or the rights deposit holders have concerning AIB's

---

9. According to Tomran, "New York law expressly recognizes Tomran's standing as a beneficial owner of shares...."

internal affairs. Had the Deposit Agreement addressed the matter, as did the agreement in *Batchelder*, the issue could have been disposed of more easily.

Maryland courts do favor the enforcement of choice of law provisions in contracts, but we are not persuaded that the language "all rights hereunder and thereunder and provisions hereof and thereof," which clearly refers respectively to the "Deposit Agreement and the Receipts," can be read so broadly as to reflect an intention by AIB to cede to the law of New York matters concerning its internal affairs, which most certainly would include the determination of who has the right to maintain a derivative suit. *See Fletcher Cyclopedia* at § 8444. Rather, we read the language to mean that New York law governs the mechanics of the ADR program itself. *See Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 336 Md. 606, 610, 650 A.2d 246 (1994) (stating that § 187 "sets forth the limitations on the parties' choice of law").

■■ Therefore, we look to the internal affairs doctrine to determine what law to apply. In *Batchelder*, the court said:

> In any event, even if we were to ignore the Deposit Agreement's choice-of-law provision, ordinary conflicts-of-law principles would direct us to apply Japanese law to Batchelder's claim. . . . Under the "internal affairs" doctrine, the rights of shareholders in a foreign company, including the right to sue derivatively, are determined by the law of the place where the company is incorporated.

*Batchelder*, 147 F.3d at 920 (citations omitted). When no choice of law provision has been agreed upon by the parties, the internal affairs doctrine would suggest that the law of the place of incorporation governs the rights and responsibilities of the parties. *See First Nat'l City Bank v. Banca Para El Comercio*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983); *Edgar*, 457 U.S. at 645, 102 S.Ct. 2629; *Koster v. Am. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 527–31, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); *Rogers v. Guar. Trust Co.*, 288 U.S.

123, 145, 53 S.Ct. 295, 77 L.Ed. 652 (1933). Therefore, because AIB is incorporated in Ireland, Irish law applies.[10]

Tomran next argues that, once the circuit court decided to apply Irish law, it was bound under the Erie Doctrine and CJ § 10–501 "actually to *predict* the way that foreign jurisdiction would rule, rather than refuse to decide the issue."[11] CJ § 10–501 states that "every court of this State shall take judicial notice of the common law and statutes of every state, territory, and other jurisdiction of the United States, and of every other jurisdiction having a system of law based on common law of England."

Tomran specifically objects to what it characterizes as the circuit court's decision not to predict the future of Irish law. The circuit court stated in its opinion:

[Tomran] has constructed a well reasoned argument as to how and why an Irish court should extend whatever rights registered shareholders have to sue a company derivatively to beneficial owners of shares, such as holders of American

---

10. Even were we to decide that New York law should apply, which we do not, the result might be the same. Tomran argues that under New York Bus. Corps. Law § 1319(a), New York is required to apply its own law to shareholder derivative actions against foreign corporations. That section states, in relevant part:

[T]he following provisions, to the extent provided therein, shall apply to a foreign corporation doing business in this state, its directors, officers and shareholders:

\* \* \*

(2) Section 626 (Shareholders' derivative action brought in the right of the corporation to procure a judgment in its favor).

When presented with this issue, a New York Supreme Court held that "B.C.L., section 1319, is not a conflict of laws rule, and does not compel the application of New York domestic law, but rather, allows the application of the center of gravity or grouping of contacts conflict rule." *Lewis v. Dicker*, 118 Misc.2d 28, 459 N.Y.S.2d 215, 216 (N.Y.Sup.1982). The Lewis court explained that the "traditional conflict of laws rule regarding the liability of corporate directors is to apply the law of the state of incorporation." *Id.*

11. The *Erie* Doctrine ordinarily requires the application of applicable state law by federal courts exercising diversity of citizenship jurisdiction. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

depositary receipts, in order to comport with the realities of modern commercial life and practice. But it is not the function of this Court to predict the direction in which Irish courts may head in the future when presented with an appropriate case of this nature. Rather, it is the obligation of this Court, under choice of law principles herein stated, to interpret the corporate law of Ireland as it exists today. Undertaking that serious responsibility, the Court is unable to find any basis in the deposit agreement or in Irish case law or statutes to support the right of a beneficial owner such as Tomran to bring a derivative action against AIB. Even the limited authority presented in the older English cases is not directly apposite to the situation presented here. Faced with a paucity of precedent and confronted by an Irish legal system that is clearly more restrictive of the rights of shareholders than our American system, this Court is unwilling to hold that Tomran has established its standing to bring this action against AIB.

We reach, through a *de novo* review, the same conclusion as the circuit court in regard to Tomran's standing. Although it is perhaps somewhat of an overstatement to say that it was not the role of the circuit court to "predict the direction in which Irish courts may head in the future," it is also an overstatement to say that the circuit court refused to decide the issue. In context, we read the circuit court's statement to say that, despite Tomran's arguments that the Irish courts are becoming more liberal in their recognition of shareholder rights and may in the future permit an owner of ADRs to bring a derivative action against an Irish corporation, there is no clear legal authority indicating that, if asked to decide this case at this time, an Irish court would find that Tomran has standing to bring the action. To that extent, the court's focus in an *Erie* like analysis or in interpreting a foreign law under CJ § 10–501 *et seq.* is necessarily time bound to the case before it. As the United States Court of Appeals for the Eighth Circuit has indicated, "This Court must look to [the foreign law] as it is and not as one might believe it ought to

be." *Carson v. Nat. Bank of Commerce Trust and Sav.*, 501 F.2d 1082, 1085 (8th Cir.1974).

## IV. Irish Company Law

We begin with a brief historical overview of Irish company law, quoting at length from *The Honorable Mr. Justice Ronan Keane, Chief Justice of Ireland, Company Law* § 2.01 (3d ed.2000).

The general structure of Irish company law is closely modeled on that of England. The reason is obvious: the two countries had a common legal tradition and, after the Act of Union in 1800 and until 1921, all statute law affecting Ireland was enacted at Westminster. While there have been substantial changes in Irish company law since 1921, it was thought better to preserve the general structure inherited from the English, and such changes as have been made since 1921 have in many instances been based on changes in the neighbouring jurisdiction. Since the accession of Ireland to the European Economic Community in 1973, however, many changes have resulted from compliance with directives of the community, now the European Union, requiring the harmonisation of company law in the member states.

Both experts in this case agreed that decisions of English courts are not binding on Ireland, but are often cited as persuasive authority. Decisions from Northern Ireland, Australia, New Zealand, and other common law jurisdictions are also frequently cited in Ireland.

Applying Irish law, the circuit court found that Tomran faced three hurdles to overcome a motion to dismiss: establish standing to bring the suit against AIB; adequately allege "fraud on the minority," in accordance with *Foss v. Harbottle*, 2 Hare 461 (1842); and, at the time that the first amended complaint was filed, prove that the Irish courts would permit a triple derivative action. Finding that Tomran had not overcome any of the three hurdles, the circuit court dismissed the complaint. As we shall explain, we hold that dismissal of the complaint was not error.

## A. Standing

█ In rendering its decision, the circuit court determined that Irish courts would not recognize Tomran's standing to bring the action because there was no authority that an ADR holder was permitted to bring a derivative action. The court considered *Hooker Investments Pty. Ltd. v. Email Ltd.*, (1986) 10 A.C.L.R. 443 and *Svanstrom v. Jonasson,* (1997) C.I.L.R. 192, two recent decisions from the common law courts of New South Wales and the Cayman Islands, holding that only a registered shareholder has standing to pursue a derivative action.

In *Hooker,* the plaintiff, who had contracted to purchase shares in the defendant company, alleged a breach of duty by the directors in their allotment of the shares. In regard to a duty owed to the company, the court stated as "the better view" that

> the company is normally the proper plaintiff, but in suitable circumstances the court will listen to proceedings brought in the name of a shareholder. However, with respect to this sort of duty it is clear that an equitable holder of shares is not permitted by the court to bring the action that the shareholder might bring.

*Hooker Investments Pty. Ltd. v. Email Ltd.,* (1986) 10 A.C.L.R. 443, 445.

In *Svanstrom,* the court considered whether a beneficial shareholder of a minority shareholding was able to bring a derivative suit, and held that such a holder did not have standing to bring an action on behalf of the company. The court recognized that, under the rule of *Foss v. Harbottle,* a minority shareholder could indeed bring an action if he could allege fraud by the controlling shareholders. Nevertheless, because the respondent in *Svanstrom* was not a registered shareholder, the court held that he did not have the authority to bring suit.

Tomran argues that these cases are not persuasive and the circuit court should have looked to Irish or English authority, which, it contends, would permit an ADR holder to bring a

derivative suit. One case cited is *Tangney v. Clarence Hotels, Ltd.*, [1993] I.R. 51, 64. There, the Irish court held that a "transferee" of shares is entitled to assert a cause of action against the corporation to require the company to register him as the owner of shares.[12] Not only is Tomran not a transferee of shares, it seeks to enforce a right of the corporation, rather than a personal right to have shares registered in its name.

Tomran asks that we seek guidance from three English cases decided in the 1800's: *Bagshaw v. Eastern Union Railway Co.*, 7 Hare 114 (1849) (considering whether the directors' appropriation of monies to a fund separate from that for which they were raised was proper, and limiting *Foss v. Harbottle* to the proposition that if the act of the directors complained of is an act that the shareholders could confirm, an action to impeach the board's action cannot be maintained); *Great Western Railway v. Rushout*, 5 DeG. & Sm. 290 (1852) (holding that beneficiaries of a trust of stock could seek an injunction to interfere with the internal management of the railway company when an unlawful application of funds is

---

12. The Articles of Association of Clarence Hotels Company, Ltd. provides:

Any member proposing to transfer any share shall give notice in writing of his intention so to do to the Directors, giving the name and address of the proposed transferee; and if the Directors are of opinion that the proposed transferee is not a desirable person to admit to membership, they may decline to register the transfer of any such share, and it shall be lawful for them, within three months of the receipt of such notice, to transfer any such share to such person as the Directors shall nominate, at such price as the person giving notice and the nominee of the Directors may agree upon; and in default of agreement at such price as the Directors may determine, and the Directors may cause the name of their nominee to be entered in the Register in respect of the share transferred by them, and the receipt of the Company shall be a full discharge to the nominee of the Directors, and after his name has been entered in the Register the validity of the transaction shall not be questioned by any person. The proceeds of any share transferred by the Directors under this Article shall be applied in or towards satisfaction of the debts, liabilities or engagements (if any) to the Company of the member whose share is transferred, and the residue (if any) paid to such member, his executors, administrators or assigns.

*Tangney v. Clarence Hotels, Ltd.*, [1993] I.R. 51, 51–52.

involved); and *Binney v. Ince Hall Coal & Channel Co.*, 35 L.J. Ch. 363 (1866) (holding that the equitable mortgagee of shares has the authority to sue the company to protect the value of the shares). None of these cases, however, provides that a holder of ADRs has the authority to bring a derivative suit. *Bagshaw* and *Great Western* involved injunction proceedings related to alleged illegal acts, and in *Binney* the equitable mortgagee also sought an injunction to restrain the company from using funds to liquidate, in part, the share-capital of its members.

The circuit court also considered the opinions of experts on Irish law in making its decision on standing. Both experts agreed that there was no Irish authority permitting an ADR holder to maintain a derivative action. Moreover, both recognized that derivative suits are not "common" in Ireland. In his deposition, McCullough, Tomran's expert, said that derivative actions are "very rare in Ireland." Ashe, the expert for the officers and directors, stated in his affidavit that "Irish law is extremely restrictive of the right of shareholders to sue in the name of and/or on behalf of the company in which they hold shares." They disagreed, however, as to the future of derivative suits in Ireland. McCullough posited that, based on the trends of other common law courts and some pronouncements in Irish legal treatises, Irish courts were becoming more liberal in permitting derivative actions. He explained that "[i]t is perfectly possible for the person appearing on the register to hold the shares in trust for someone else," and for Irish courts to recognize that this creates an "equitable interest in shares."

Ashe, on the other hand, claimed that

there is no authority under Irish law for a person who is not an actual registered owner of shares in the company to bring such an action regardless of the claim being asserted. Thus there is no authority for extending locus standing to permit a person such as the plaintiff Tomran, which owns ADRs and not AIB ordinary shares, to maintain this action.

The Irish legal texts that have been consulted also indicate that, although corporate law may be changing in Ireland, derivative suits still remain uncommon and difficult to sustain.[13]  *See The Honorable Mr. Justice Ronan Keane, Chief Justice of Ireland, Company Law* (Butterworths 3d ed.2000); *Robert R. Pennington, Company Law,* ch. 17 (Butterworths 7th ed 1995); *Patrick Ussher, Company Law in Ireland,* ch. 8 (London: Sweet and Maxwell 1986).  Certainly, none of the texts cited a case or statute that permitted an ADR holder to sue derivatively on behalf of a corporation.  The question is not what we believe an Irish court should hold if it were deciding this case, but, rather, based on Irish law and applicable precedent, what would the Irish court decide.  In the absence of some clear authority for such a right, we are not

---

13.  The Honorable Chief Justice Keane, in his treatise on Company Law, suggests with the accession of Ireland to the European Union in 1973, the "harmonisation of company law," requires that the law from the European Union also be considered.  *The Honorable Mr. Justice Ronan Keane, Chief Justice of Ireland, Company Law* § 2.01 (Butterworths 3d ed.2000).  When we do, we find that derivative suits are also uncommon and difficult to maintain in other members of the European Union.  *See* Alfred F. Conard, *The Supervision of Corporate Management: A Comparison of Developments in European Community and United States Law,* 82 Mich. L.Rev. 1459, 1482 n. 147 (1984) (stating that France and Germany have high thresholds for bringing derivative suits; in France, shareholders aggregating 5% of the equity may bring a derivative suit and Germany requires 10% of shareholder approval to bring a derivative suit); Donna Ferrara, *Protecting Your Decision–Makers Abroad: A Few Issues on Global Protection,* 15 No. 2 Andrews Corp. Off. & Directors Liab. Litig. Rep. 15, n. 13 (1999) (stating that the Netherlands does not permit derivative suits); Susan–Jacqueline Butler, *Models of Modern Corporations: A Comparative Analysis of German and U.S. Corporate Structures,* 17 Ariz. J. Int'l & Comp. L. 555, 569,(2000) (stating that "German corporate law generally does not recognize derivative suits by shareholders"); Brian R. Cheffins, *Current Trends in Corporate Governance: Going From London to Milan Via Toronto,* 10 Duke J. Comp. & Int'l L. 5, 34 (1999) (stating that the "individual shareholders in Italian companies traditionally have not been able to bring derivative suit against directors, now a minority representing at least five percent of the issued capital of a listed company may do so"); Vassil Breskovski, *Directors' Duty of Care in Eastern Europe,* 29 Int'l Law. 77, 96 n. 130 (1995) (stating that in Poland, a derivative action is statutorily permitted).  A need to liberalize the standing requirements for derivative suits does not appear to be required by Ireland's membership in the European Union.

persuaded that an Irish court, confronted with this case at this time, would hold that Tomran has standing to sue derivatively under Irish law.

## B. Fraud on the Minority

■ Had Tomran cleared the standing hurdle, a critical prerequisite for bringing this action would remain. "The basic theme of Foss v. Harbottle (1843) 2 Hare 461 is that where a wrong has been done to a company it is for the company itself to seek redress for the injury done to it. . . ." *O'Neill v. Ryan,* [1993] I.L.R.M. 557, 559. Thus, it is typically within the corporation's discretion to bring suit on its own behalf.

A recognized exception, and one upon which appellant relies, is based on alleged "fraud on the minority."[14] In the recent Irish case of *Crindle Investments v. Wymes, et al.,* [1998] 2 I.L.R.M. 275, the court explained:

> "The cases in which the minority can maintain such an action are . . . confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company. A familiar example is where the majority are endeavouring directly or indirectly to appropriate to themselves money, property, or advantages which belong to the company or in which the other shareholders are entitled to participate. . . ."

To make out such a case it is not, of course, necessary to establish that there was fraudulent conduct in the criminal sense. Doubts have even been expressed as to whether

---

14. In *Foss v. Harbottle,* there are four recognized exceptions that allow a shareholder to bring a cause of action against a company: (1) when the majority commits an act which is illegal or *ultra vir es;* (2) if a decision requires more than a simple majority to ratify and the company purports to act on the decision of the simple majority; (3) when an action affects the personal rights of the shareholders; and (4) "fraud on the minority." *Foss v. Harbottle,* [1843] 2 Hare 461. In *Moylan v. Irish Whiting Manufacturers Ltd* [1980] I.C.L.R. 280, 297, Justice Hamilton suggested a possible fifth exception, which would allow a shareholder to bring a cause of action "where the justice of the case demands it." No action by a shareholder has been permitted under this exception.

fraud in any sense needs to be established: thus, Templeman J . . . . said:

"The authorities which deal with simple fraud on the one hand and gross negligence on the other do not cover the situation which arises where, without fraud, the directors and majority shareholders are guilty of a breach of duty which they owe to the company, and **that breach of duty not only harms the company but benefits the directors. If minority shareholders can sue if there is fraud, I see no reason why they cannot sue where the action of the majority and the directors, though without fraud, confers some benefit on those directors and majority shareholders themselves.** It would seem to me quite monstrous—particularly as fraud is so hard to plead and difficult to prove—if the confines of the exception to *Foss v. Harbottle* . . . were drawn so narrowly that directors could make a profit out of their negligence." [ (Citations omitted; emphasis added.) ]

To fall within this exception, as Cronin argued in his brief, Tomran had to plead in its complaint that "a majority who are in control of a company" perpetrated a fraud on the minority. *See The Honorable Mr. Justice Ronan Keane Chief Justice of Ireland, Company Law,* 310 (Butterworths 3d ed.2000). As pointed out by Ashe in his affidavit, Tomran does not allege that the AIB directors own or control a majority of AIB's shares. In fact, from the pleadings it cannot be determined that the overlap directors, *i.e.,* directors or officers of the Allfirst boards that also serve on the AIB board, represent or otherwise control a majority of the board of AIB.

In addition, the amended complaint states, in pertinent part, "The egregious conduct by various officers and board members deviated from the required standard of care, and amounted to gross negligence and worse." The alleged deviations in the standard of care are:

(a) The inexplicable decision for the Bank to have a proprietary foreign currency trading business in the first place. After the 1995 currency trading scandal that

brought down Barings Bank,[15] the clear danger of a bank running a smaller, less sophisticated foreign currency trading operation with insufficient internal controls was well known to everyone in the banking industry, including these defendants. Put simply, the substantial risk in running such an operation could not have justified the very limited potential returns. Nonetheless, the [officers and directors] ignored the warnings from 1995 on and permitted virtually the same uncontrolled trading that brought down Barings Bank. Indeed, in early 2001, AIB made the late, but appropriate decision to centralize foreign currency trading operations at AIB's Dublin headquarters; again, however, as with the Barings Bank 1995 storm warning, the reasoning underlying this decision to centralize trading operations was ignored, and Allfirst Bank's smaller, less sophisticated foreign currency trading operation with insufficient internal controls continued—with corresponding disastrous results.

(b) The egregious lack of effective, necessary controls by the [officers and directors] was an open invitation for Mr. Rusnak to engage in:

(i) the purchase of fictitious options which masked the true extent of his trading and the risks posed by it;

(ii) the use of "prime brokerage accounts" which once again disguised the scope and risks of Rusnak's trades;

(iii) inappropriate "historic-rate rollovers," well-known in currency trading circles to be dangerous; and

(iv) the sale of "deep-in-the-money" currency options that were, by any objective standard, horribly inappropriate, risky gambles which were doomed to failure.

(c) Such lack of effective, necessary controls by the [officers and directors] included:

(i) the Bank's foreign currency trading positions were improperly based on prices *provided by the currency*

---

15. In February 1995, Nichloas Leeson was a proprietary foreign exchange trader for the Singapore office of Barings Bank. Leeson engaged in a series of unauthorized proprietary foreign currency trades that caused Barings Bank to lose $1.4 billion and eventually to collapse.

*trader*, Rusnak, and *not* by independent sources, as they should have been;

(ii) the failure of the Bank's Board of Directors and its Audit Committee to ensure adequate staffing, experience, and proper focus on risk management and internal controls in the risky foreign exchange trading;

(iii) the failure of the Board and Audit Committee to ensure that a senior risk advisor, *independent of management*, conducted a regular and comprehensive review of the Bank's internal controls;

(iv) the failure of the Bank to have adequate risk assessment controls related to foreign currency trading— *the Bank assigned only a single full-time employee to assess risk in the foreign exchange portfolio, and she was then a 25–year–old graduate student who was extremely inexperienced and received negligible supervision/support from others;*

(v) the failure to heed clear warnings of the ongoing currency trading fraud, including: (a) in early 2000, the Bank's Control Market Risk being downgraded from "good" to "weak" by the Bank's own risk assessment analyst; (b) in May of 2001, a market source suggesting to AIB that Allfirst was engaged in inappropriately heavy foreign exchange trading; and (c) numerous warnings from the Bank's regulatory body, the Office of the Comptroller of the Currency, about a wide variety of serious weaknesses in the bank's internal controls; and

(vi) other deficiencies, discussed below.

(d) The Bank, contrary to the practice of similar institutions, engaged in a practice whereby its Treasurer was responsible for *both* profitable trading *and* effective controls over that trading. Such a practice presents inherent conflicts, and, inevitably, undercuts effective oversight when the pressure to maintain or increase profits becomes primary.

(e) The [officers and directors], and AIB's directors and senior officers, engaged in a practice of "triple reporting" which was doomed to failure. At times, the Bank's Treasur-

er, David Cronin, reported to the Bank's Chief Executive Officer; at other times, Cronin informally reported to AIB's senior executives in Dublin; and, at still other times, Cronin reported to the Bank's Chief Financial Officer. Contrary to accepted practice—which required the Bank's Treasurer to report directly and continuously to one person, preferably AIB—this "triple reporting" presaged the disaster that eventually befell the Bank.

(f) Certain Defendants' misguided efforts to cut expenses prevented the Bank from using even minimally appropriate computerized risk management and trade confirmation systems, which would have materially increased the chance of early detection or mitigation of the foreign currency trading fraud. As an example, because of the $10,000 expense, the Bank failed to obtain a second Reuters data line to check prices on Rusnak's currency trades, preferring instead to accept Rusnak's word as to those prices.

(g) Rusnak's annual bonus arrangement was directly linked to his foreign currency trading profits, in stark contrast to the bonus arrangement for Rusnak's superiors, which were based on the Bank's profitability as a whole. Apparently, Rusnak could not resist the obvious invitation for him to falsify his profits or improperly speculate—an invitation wrongfully originated and countenanced by the [officers and directors].

The allegations of the amended complaint are essentially negligence or gross negligence. Both experts agree that a "mere allegation" of negligence or even gross negligence does not constitute fraud on the minority.[16] It is alleged generally, in paragraphs 26 and 28, that the directors and officers somehow personally benefitted from the "materially under-

---

**16.** McCullough believes that if you can prove that the director or officer was motivated to act negligently or with gross negligence to receive a benefit (financial or otherwise) then that may be enough to satisfy fraud on the minority. He opined that "if it were established that the [officers and directors] were thus motivated when they determined not to take action, their actions would fall within the fourth exception [fraud on the minority] to the rule...."

stated revenues and from the 'profits' generated by the currency trading scheme." [17]

There is no indication of how understated revenues and any profits from the currency trading would benefit the officers and directors differently than it would benefit all the shareholders. We share the view of the circuit court that the "bald

---

17. Paragraphs 26 and 28, respectively, state:
   26. The plaintiff has satisfied all conditions precedent to the filing of this triple derivative action. Plaintiff owns American depositary shares in the sole publicly-traded company (AIB) which owns or controls Allfirst Bank, and it has made due demand upon the boards of AIB, Allfirst Financial and Allfirst Bank for the prosecution of these claims, by letters dated March 6 and April 5, 2002 (copies of which are attached as Exhs. A and B). The boards of each nominal defendant have failed and refused to take action on those demands, because they bear responsibility for the currency trading losses; because, upon information and belief, some or all of the board members of the nominal defendants received a benefit, financial or otherwise, from the materially understated revenues and from the "profits" generated by the currency trading scheme; because they are current or potential defendants in this proceeding; and because they are working under real and substantial conflicts of interest in the investigation and prosecution of claims against any of the Bank's directors or its senior officers.
   28. To the extent that Irish law applies, the acts and omissions of the board members of the three nominal defendants as outlined in this complaint were more than sufficient to permit maintenance of this derivative proceeding. The board members committed negligence, gross negligence or worse in their direction and management of the business and affairs of the Bank, causing direct and substantial injury to the Bank. Also, the boards' refusal to initiate litigation against the [directors and officers], which resulted directly from the multiple conflicts of interest described in this complaint, was an abuse of their power and an appropriation of the nominal defendant's property—its valuable claims against the [directors and officers]—for no benefit to the nominal defendants and their shareholders. Finally, upon information and belief, some or all of the board members benefitted financially or otherwise from the understated expenses and phantom profits of the Bank's currency trading. Consequently, the boards' acts and omissions—including their refusal to seek recovery from the [directors and officers]—amounted to a fraud on the minority of shareholders. Further, for all the additional reasons set forth in this complaint, the interests of justice require that plaintiff be permitted to maintain this derivative proceeding. In addition, no other actions by the plaintiff, including actions at a general or shareholders' meeting, or other legal proceedings seeking a different form of relief, would be timely, effective or appropriate to obtain the relief sought in this proceeding.

allegations" of paragraphs 26 and 28, without some factual indication of how "some or all" of the directors and officers breached their duty for personal benefit, are not sufficient to plead the "fraud on minority" exception to the rule in *Foss v. Harbottle*, either in Ireland or in Maryland.[18]  In the words of the *Crindle Investments* Court, paragraphs 26 and 28 do not allege facts with reasonable certainty and clarity that by their actions the officers and directors were "endeavoring directly or indirectly to appropriate to themselves, money, property, or advantages which belong to the company, or in which the other shareholders are entitled to participate...." *Crindle Investments v. Wymes, et al.*, (1988) 2 I.L.R.M. 275, 289 (citations omitted).  Assuming the truth of all allegations of the pleadings, we hold, alternatively, that the amended complaint does not establish a cause of action based on the "fraud on the minority" exception to the rule of *Foss v. Harbottle*.

### C.  Triple Derivative Suit

The circuit court also found that there was no evidence "to suggest to this Court that Ireland is about to permit double or triple derivative actions by even registered shareholders." We agree, but it appears that the merger of Allfirst Financial with M & T Bank on April 1, 2003, has rendered this question moot.

### V.  Motion to Amend

Tomran next contends that the trial court abused its discretion in denying its motion to amend the complaint.  Abuse of discretion has been defined as a " ' "reasoned decision based

---

**18.**  *See Goodwich v. Sinai Hospital of Baltimore, Inc.*, 343 Md. 185, 205, 680 A.2d 1067 (1996) (stating that when the court substantively applies law from another jurisdiction, " '[t]he law of the forum governs procedural matters.' " (quoting *Rein v. Koons Ford*, 318 Md. 130, 147, 567 A.2d 101 (1989) citing *Vernon v. Aubinoe*, 259 Md. 159, 162, 269 A.2d 620 (1970))).  Although we apply substantive Irish law, for procedural matters we apply Maryland law.  In Maryland, "bald allegations" alone are insufficient to maintain a claim.  *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 173, 857 A.2d 1095 (2004); *Doe v. Archdiocese of Washington*, 114 Md.App. 169, 187, 689 A.2d 634 (1997).

on the weighing of various alternatives." There is an abuse of discretion *"where no reasonable person would take the view adopted by the [trial] court*[.]"'" *Metheny v. State,* 359 Md. 576, 604, 755 A.2d 1088 (2000) (quoting *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312, 701 A.2d 110, 118 (1997) (citations omitted; emphasis added in *Metheny* )). To be sure, Maryland does construe the right to amend liberally, "to promote the ends of justice." *Staub v. Staub,* 31 Md.App. 478, 480, 356 A.2d 609 (1976) (citations omitted). *See also Maryland Bd. of Nursing v. Nechay,* 347 Md. 396, 408, 701 A.2d 405 (1997).

After the trial court had issued its order in this case, Tomran attempted to amend its first amended complaint to add as a plaintiff to the action the Bank of New York ("BONY"), the record owner of the AIB shares corresponding to Tomran's ADRs. Tomran argues that "[h]ad BONY been joined as a Plaintiff [voluntarily or involuntarily], BONY either could have made an assignment of rights to Tomran or could have pursued the derivative action directly, pursuant to its fiduciary obligations to its beneficiary, Tomran."

Assuming that BONY, or Tomran as BONY's assignee, would have standing to bring a derivative suit, the pleading deficiency discussed in Section IV B would remain.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**