768 A.2d 94

**PHILLIPS WAY, INC.**

v.

**PRESIDENTIAL FINANCIAL CORPORATION
OF THE CHESAPEAKE, et al.**

**No. 0170, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

March 6, 2001.

---

Kenneth K. Sorteberg (William M. Huddles and Huddles & Jones, P.C. on the brief), Columbia, for appellant.

Eric A. Frechtel (David D. Gilliss and Niles, Barton and Wilmer on the brief), Baltimore, for appellee.

Argued before MOYLAN,* SONNER and ADKINS, JJ.

ADKINS, Judge.

In this case, we must determine whether an accounts receivable lender is a "subcontractor" within the meaning of the Maryland's construction trust fund statute, Md.Code. (1974, 1996 Repl.Vol.), § 9–201 *et seq.* of the Real Property Article ("Construction Trust Statute"). The Construction Trust Statute makes contractors and subcontractors liable in trust for monies paid to them for work done or materials furnished for a building by a subcontractor. Phillips Way, Inc., appellant, contends that the Circuit Court for Baltimore City erred in dismissing its complaint against Presidential Financial Corpo-

---

* Moylan, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

ration of the Chesapeake ("Presidential"), and its officers and managing agents, Richard Sinclair, Nicole Imhoff, and Amy Eads (collectively "appellees"),[1] under the Construction Trust Statute. On appeal, appellant presents two questions, which we have rephrased:

I. Whether the circuit court erred by dismissing its complaint without conducting a hearing on the merits, and apparently without considering its written position on the merits.

II. Whether a cause of action was alleged against appellees under the Construction Trust Statute on grounds that either:

(a) Presidential was a "subcontractor" within the defined meaning of the statute, or

(b) Presidential exercised control over the disbursement of construction funds with knowledge that they were trust funds.

We hold that none of the appellees were "subcontractors" within the meaning of the Construction Trust Statute. Presidential, however, can potentially be held liable under the statute if it exercised control over trust funds with knowledge that they were trust funds used to pay other debts of the subcontractor-trustee. Because these issues are reviewed as a matter of law based upon the pleadings, there is no need to address appellant's first issue, whether the trial court erred in failing to consider appellant's written opposition to appellant's motion to dismiss. *See State v. Jones*, 103 Md.App. 548, 606, 653 A.2d 1040 (1995) (on questions of law, appellate courts apply the nondeferential *de novo* standard of review).

## FACTS AND LEGAL PROCEEDINGS

Because this appeal is from the grant of a motion to dismiss, all of the recited facts are taken from the allegations in the

---

1. "Appellees" refers to Presidential as well as the individual appellees. Richard Sinclair is Presidential's executive vice-president, Nicole Imhoff is a vice-president at Presidential, and Amy Eads is a manager at Presidential.

amended complaint.[2]   Appellant was the general contractor on two public construction projects at the Baltimore City Community College ("BCCC") and Crofton Elementary School ("Crofton") (collectively "the Projects").   Appellant entered separate subcontracts with Power, Alarm and Communications, Inc. ("PACS") to perform electrical alarm and communication works on these projects.

In furtherance of these subcontracts, PACS entered into a number of subcontracts.   On the BCCC project, PACS contracted with Capital Lighting and Supply, Inc., ("Capital Lighting") to provide materials.   On the Crofton project, PACS contracted with Capital Lighting to provide materials, with Baltimore Sound Engineering, Inc. ("Baltimore Sound") to provide work and materials, and with Electrical Workers Union Local No. 26 (the "Union") to provide labor.

Presidential, an accounts receivable lender, advances money based upon the accounts receivables of borrowers.   Presidential entered into a contract with PACS to lend money to PACS, with the loans secured by a security interest in PACS' accounts receivable.

As general contractor, appellant made a number of payments for work performed on the two projects, by checks made payable jointly to PACS and Presidential, totaling $84,183.62.   These payments were made "on behalf of Capital Lighting, Baltimore Sound and the Union, all of which provided work and/or materials to PACS on the Projects."   PACS transferred and indorsed these checks to Presidential for the purpose of paying creditors other than PACS' subcontractors. Presidential had actual knowledge that these checks were being used to pay such other debts of PACS.   PACS subsequently went out of business and never made payment to Capital Lighting, Baltimore Sound, or the Union.   Presidential has refused appellant's request to return the funds or to use them to pay Capital Lighting, Baltimore Sound, and the

---

**2.**   In Section II(B)(1), *infra,* we explain why we consider the amended complaint, rather than the complaint which was the subject of the motion to dismiss.

Union. Capital Lighting, Baltimore Sound, and the Union have made claims against appellant's payment bond on the Projects.

On November 8, 1999, appellant filed suit under the Construction Trust Statute against appellees to recover the funds paid jointly to PACS and Presidential. On December 22, 1999, appellees filed a Motion to Dismiss or in the Alternative Motion for Summary Judgment ("Motion to Dismiss"), contending that no cause of action existed against them under the Construction Trust Statute. They argued that, "[i]n its capacity as a lender for PACS, [Presidential] is not subject to the prescriptions of statutory provisions that govern trust relationships in the construction industry."

The parties agreed to extend appellant's time for answering the motion to dismiss. On January 4, 2000, appellant sent a letter confirming their agreement with a copy to the circuit court. The parties then made a further agreement to extend the response time until January 21, 2000, and a confirming letter dated January 17 was sent to the court. Due to an inadvertence in the clerk's office, these two letters were not entered into the record until June 15, 2000. In accord with the parties' agreement, appellant filed a response to appellees' Motion to Dismiss on January 21, 2000.

Despite the agreed-upon extensions, the circuit court signed an order granting appellees' motion on January 14, which was docketed on January 27, 2000. The court noted that "no opposition ha[d] been filed" by appellant, and granted the motion "for the reasons stated in [appellant's] supporting memorandum." Prior to the docketing of this order, on January 21, 2000, appellant filed an Amended Complaint. On February 2, 2000, appellant filed a Request for Hearing and a Motion to Alter or Amend Judgment ("Motion to Alter or Amend"). This motion requested that the court "rule upon said Motions after due consideration of all Oppositions, Replies and oral arguments."

A motions hearing was scheduled for March 10, 2000. On March 3, 2000, the circuit court entered an order denying appellant's motion without explanation.[3] This appeal followed.

## DISCUSSION

The Construction Trust Statute governs trust relationships among contractors in the construction industry. Section 9–201 provides, in pertinent part:

(a) *Definition.*—For the purposes of this subtitle, "managing agent" means an employee of a contractor or subcontractor who is responsible for the direction over or control of money held in trust by the contractor or subcontractor under subsection (b) of this section.

(b) *Moneys to be held in trust.*—(1) Any moneys paid under a contract by an owner to a contractor, or by the owner or contractor to a subcontractor for work done or materials furnished, or both, for or about a building by any subcontractor, shall be held in trust by the contractor or subcontractor, as trustee, for those subcontractors who did work or furnished materials, or both, for or about the building, for purposes of paying those subcontractors.

(2) An officer, director, or managing agent of a contractor or subcontractor who has direction over or control of money held in trust by a contractor or subcontractor under paragraph (1) of this subsection is a trustee for the purpose of paying the money to the subcontractors who are entitled to it.

Any officer, director, or managing agent of a contractor or subcontractor who knowingly retains or uses trust funds for purposes other than paying the subcontractor for whom the money is held in trust is personally liable for damages. *See* RP § 9–202. "Owner," "contractor," and "subcontractor" "have the same meaning as in § 9–101 of [subtitle 1 governing

---

**3.** The hearing was scheduled before a different judge than the one who entered the order.

mechanic's liens]." RP § 9–204(c). Section 9–101 provides the following definitions:

> (d) *Contractor.*—"Contractor" means a person who has a contract with an owner.

* * *

> (f) *Owner.*—"Owner" means the owner of the land except that, when the contractor executes the contract with a tenant for life or for years, "owner" means the tenant.
> (g) *Subcontractor.*—"Subcontractor" means a person who has a contract with anyone except the owner or his agent.

The Court of Appeals has recognized that the purpose of the Construction Trust Statute is "to protect subcontractors from dishonest practices by general contractors and other subcontractors for whom they might work." *Ferguson Trenching Co., Inc. v. Kiehne,* 329 Md. 169, 174–75, 618 A.2d 735 (1993).

### I. Presidential Is Not A "Subcontractor" Under The Construction Trust Statute

■ Appellant contends that Presidential is *per se* liable as a trustee because it falls under the section 9–101(g) definition of "subcontractor." The definition contained in section 9–101(g) is broad, and encompasses "a person who has a contract with anyone except the owner or his agent." The Court of Appeals, however, has recognized that "[t]he extremely broad definition of 'subcontractor' is narrowed by § 9–101(b) which defines 'contract' as 'an agreement of any kind or nature, express or implied, for doing work or furnishing material, or both, for or about a building as may give rise to a lien under this subtitle.' " *National Elec. Indus. Fund v. Bethlehem Steel Corp.,* 296 Md. 541, 545, 463 A.2d 858 (1983). Applying this restriction, Presidential is not a subcontractor as contemplated in section 9–101 because it neither did work nor furnished materials on the Projects.

Appellant contends that the section 9–101(c) definition of "contract" should not apply because section 9–204 "expressly imports three ... definitions from Subtitle 1—'owner,' 'contractor,' and 'subcontractor,' [and] the legislature specifically

opted not to import the definition of 'contract' from Subtitle 1." We are persuaded, however, by appellees' argument to the contrary.

■ It is a well-established rule of statutory construction that legislative intention "is to be discerned by considering [a statute] in light of the statutory scheme." *GEICO v. Ins. Comm'r*, 332 Md. 124, 132, 630 A.2d 713 (1993). In taking this broader perspective, we are persuaded that the definition of "subcontractor" in section 9–101(g) contemplates incorporation of the definition of "contract" from section 9–101(c). To hold otherwise would create an illogical result by requiring an inconsistent definition of "subcontractor," depending on whether the mechanic's lien provisions of Subtitle 1 or the Construction Trust Statute provisions of Subtitle 2 are applicable. Moreover, utilizing the section 9–101(c) definition of "contract" is consistent with the purpose of the Construction Trust Statute—to protect subcontractors from dishonest general contractors and other subcontractors "for whom they might work." *Ferguson Trenching*, 329 Md. at 174–75, 618 A.2d 735.

If we followed appellant's interpretation, *any* party doing business with PACS for *any purpose* could potentially face liability under the Construction Trust Statute if it received funds that were intended to pay subcontractors. A contracting business would be required to investigate PACS' practices and ensure that any funds received that are earmarked for subcontractors are actually paid to subcontractors—or risk liability under the Construction Trust Statute. Obviously, the Construction Trust Statute is not intended to impose such sweeping responsibilities and liabilities.

Accordingly, we hold that Presidential does not fit the statutory definition of "subcontractor," and therefore is not *per se* liable under section 9–201 for retaining the funds.

## II. Appellees May Be Liable As Involuntary Trustees With Knowledge

As an alternate theory of liability, appellant asserts that appellees stand in the position of "involuntary trustees" who

hold the proceeds of the construction funds in trust because they accepted them with knowledge that they were construction trust funds. Appellant relies on *Sandpiper North Apartments, Ltd. v. American Nat'l Bank and Trust Co. of Shawnee*, 680 P.2d 983 (Ok.1984). Appellees oppose this theory of recovery, arguing that it would be against public policy to subject lenders to such liability because it would unduly impose upon lenders the obligation to monitor the financial records of their borrowers. Because we have found no Maryland case on point, we will examine the out-of-state authorities and treatises to explain our decision.

### A. Out–Of–State Law Regarding Third Party Dealings With Trustees

The only case that we have found to be factually apposite is *Sandpiper North*, cited to us by appellant. In that case, Sandpiper hired a general contractor, who in turn hired Midwest Engineering as a subcontractor. Midwest obtained financing from American National Bank and Trust Co., and "assigned to the Bank the proceeds of its subcontracts as security for loans made with the [c]ontractor's knowledge." *Id.* at 986. Under the agreement, Midwest and the bank were to be made co-payees of checks for work done on the projects. After Midwest failed to keep the projects free of liens, the general contractor sued Midwest and the bank for restitution of payments not applied to discharge valid liens. The general contractor argued that under the Oklahoma construction trust fund statute,[4] "Midwest and the Bank became 'co-trustees' of all the progress payments made to Midwest." *Id.*

---

4. The applicable Oklahoma statute provided that funds payable under any building contract "shall, upon receipt by any contractor or subcontractor, be held as trust funds for the payment of all lienable claims due and owing or to become due and owing by such contractors or subcontractors by reason of such building or remodeling contract." 42 Okla. Stat. § 152(1) (1971). Additionally, "such trust funds shall be applied to the payment of said valid lienable claims and no portion thereof shall be used for any other purpose until all lienable claims due and owing or to become due and owing shall have been paid." 42 Okla. Stat. § 153(1) (1971).

The court rejected the general contractor's contention that liability under the statute extends to any party receiving any money. The court did, however, hold that the bank may be liable if it had knowledge that the funds were to be used as trust funds earmarked for subcontractors.

The Legislature's intent doubtless was that the named recipients be charged with a fiduciary duty over construction funds. The term 'recipient,' within the context of these enactments, denotes one who is in control of the trust funds and is thus able to effect their disbursement.... If some person *other than* a statutorily identified recipient is found to have *actually exercised* control over disbursement of *any* money, knowing it to be a part of the trust funds, that person may be regarded *pro tanto* as an involuntary trustee. But the mere fact that one *other than* a statutory trustee is actually able, or has the opportunity, to control the application of some or all trust funds is *alone* insufficient to cast that person in the role of involuntary trustee. The involuntary trustee status may be imposed only on one who knowingly *takes charge* of the trust res, or any of its parts. A lender may thus become liable *qua* trustee of a construction trust res over which it assumed to exercise control and from which money came to be wrongfully diverted or misapplied.

*Id.* at 988 (emphasis in original). The court held that the Bank would be entitled to proceeds out of the trust fund to the extent that Midwest was permitted to keep funds as a lien claimant on the project. *Sandpiper,* 680 P.2d at 989.

When we consider *Sandpiper* in light of general principles regarding third persons dealing with trustees, we find the reasoning in *Sandpiper* to be persuasive. *Cf. Ins. Co. of North America v. Genstar Stone Products Co.,* 338 Md. 161, 184–85, 656 A.2d 1232 (1995) (citing the quoted reasoning of *Sandpiper* with approval in the context of determining when a materialman would be treated as a trustee under the Construction Trust Statute). George G. Bogert, in the *The Law of Trusts and Trustees,* (Rev.2d ed.1983), applies analogous rules of liability to third persons dealing with a trustee:

> [T]he beneficiary has a right that no third person shall knowingly aid the trustee in committing a breach of his duties. There is no dispute with regard to this principle but there are many difficulties in deciding whether certain conduct amounts to participation in a breach. . . . If a third party takes part with the trustee in a breach of trust, the alternative remedies of a money claim or tracing of trust property may be applied to him. . . .

Bogert, § 868, at 103–104. Bogert identifies two elements for wrongful participation in a breach of trust: "(1)an act or omission which furthers or completes the breach of trust by the trustee; and (2) knowledge at the time that the transaction amounted to a breach of trust, or the legal equivalent of such knowledge." *Id.*, § 901, at 311. Bogert also has addressed the situation when, as here, the third person is an individual creditor of the trustee:

> There is general agreement that if a person who has a claim against the trustee in his individual capacity accepts from the debtor, in payment of the debt, or as security therefor, property which the creditor knows or should know is trust property, the recipient takes part in a breach of the fiduciary obligation.

*Id.*, § 904, at 332, 336.

Section 288 of the *Restatement (Second) of Trusts* (1958) ("Restatement") recognizes a similar rule. "If the trustee in breach of trust transfers trust property to a person who takes with notice of the breach of trust, the transferee does not hold the property free of the trust, although he paid value for the transfer." With regard to the thorny question of what constitutes notice of the breach of trust, the *Restatement* explains:

> A person has notice of a breach of trust if
>
> (a) he knows or should know of the breach of trust, or
>
> (b) by statute or otherwise he is subjected to the same liabilities as though he knew or should have known of the breach of trust, even though in fact he did not know and had no reason to know of the breach of trust.

*Restatement,* § 297. Comment a of section 297 elaborates on what constitutes notice of a breach of trust.

> A third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust.

Comment d is instructive on the nature of the inquiry that the third party must make.

> The nature and the extent of the inquiry which he should make depends upon all the circumstances. He should at least make inquiry of the transferor. If the transferor informs him that there is no trust, and he reasonably believes that the transferor is telling the truth and no other sources of information are available, the transferee is not chargeable with notice of a trust. If however, there are other sources of information reasonably available, the transferee should make further inquiries.

Applying these teachings to the case before us, we next examine whether appellant stated a cause of action. A court should only grant a motion to dismiss when "the complaint does not disclose, on its face, a legally sufficient cause of action." *Hrehorovich v. Harbor Hosp. Ctr.,* 93 Md.App. 772, 785, 614 A.2d 1021 (1992), *cert. denied,* 330 Md. 319, 624 A.2d 490 (1993); Md. Rule 2–322(b)(2).

### B. The Sufficiency Of The Complaint

### 1. Whether To Consider The Amended Complaint

To determine whether appellant alleged a cause of action, we first must decide whether to evaluate the allegations of the complaint or the amended complaint. The amended complaint contains more particularized allegations to support appellant's "involuntary trustee" theory. In explaining our decision to

consider the amended complaint, we will touch upon the circumstances complained of by appellant in its first issue, although in a different context.

As we previously indicated, appellant secured an agreement to extend the time for filing an opposition to appellees' motion to dismiss, and timely filed its opposition within the extension period, requesting a hearing on the motion. It filed the amended complaint on the same date as its opposition. Through no fault of the trial court or either party, the trial court was not aware of the parties' agreed extension. Thus, the trial court granted the motion to dismiss without considering the amended complaint. The amended complaint had been filed, however, and was available for consideration by the court when appellant filed its Request for Hearing and Motion to Alter or Amend Judgment on February 2, 2000. As the trial court did not comment on the reason for dismissal, we could interpret this denial in two ways. One interpretation is that the court considered the amended complaint, and nevertheless determined it was proper to grant the motion to dismiss. Another interpretation is that the court declined to consider the amended complaint.

Under either interpretation of the trial court's ruling, we believe the amended complaint should be considered. If the trial court considered the amended complaint, so should we. On the other hand, if the trial court declined to consider the amended complaint, such denial was tantamount to denying leave to file an amended complaint after a motion to dismiss. Under Maryland Rule 2–341(a), "a party may file an amendment to a pleading at any time prior to 15 days of a scheduled trial date." Further, "amendments shall be freely allowed when justice so permits." Rule 2–341(c). There had been no prior amendment, and the period of the extension agreed to by the parties was not a lengthy one. Under the circumstances, in the absence of prejudice to appellees, such a denial would constitute an abuse of discretion. *See, e.g., Hall v. Barlow Corp.*, 255 Md. 28, 46, 255 A.2d 873 (1969)(denial of leave to amend held to be abuse of discretion); *Epps v. Simms*, 89 Md.App. 371, 379, 598 A.2d 756 (1991)(denial of leave to amend

held to be abuse of discretion); *Gallant v. Bd. of School Comm'rs of Baltimore,* 28 Md.App. 324, 329, 345 A.2d 448 (1975) (denial of leave to amend held to be abuse of discretion). For these reasons, we will consider the allegations of the amended complaint in deciding whether Phillips Way has stated a cause of action against appellees.

## C.   The Allegations Of The Amended Complaint

### 1.   Liability Of Presidential

In analyzing the amended complaint, we shall consider the claims against Presidential separately from the claims against the individual appellees, because they stand in different positions. With regard to the claim against Presidential, the amended complaint alleges that Presidential accepted a joint check from Phillips Way to Presidential and PACS as payment on a construction project that falls within the Construction Trust Statute. PACS indorsed this check to Presidential. The amended complaint also alleges that appellees "knew that those funds originated from the BCCC and Crofton projects, and were intended to be applied to the payment of the work and materials provided by PACS' workmen, subcontractors and suppliers to the BCCC project and to the Crofton project on behalf of PACS."

We have little trouble in concluding that the language of the amended complaint is sufficient to allege that Presidential knew that the funds received from Phillips Way were trust funds pursuant to the Construction Trust Statute, and that the funds were intended to pay subcontractors. A closer question is whether these allegations were sufficient to meet the requirement that Presidential have notice that PACS was acting in breach of trust when it indorsed the check to Presidential. Missing from the amended complaint is any allegation that Presidential knew that PACS had not paid its subcontractors, which it could have done with funds other than the checks in question. We rely upon the principles set forth in *Sandpiper, Bogert,* and the *Restatement* to reach the conclusion that it was not necessary to allege or prove specific

knowledge that subcontractors had not been paid in order to state a cause of action.

Because of the nature of its business, Presidential should have known that PACS stood as trustee of the funds for the benefit of its "down-the-line" subcontractors. This presumed knowledge imposed upon Presidential at least the obligation to inquire of PACS, in a reasonably diligent manner, whether those subcontractors had been paid. *See Restatement* § 297, comment a; Bogert, *supra,* § 904. One reasonable inference from this knowledge is that Presidential knew that PACS did not have another means to pay its subcontractors. Unless the response to Presidential's inquiry to PACS would cause a reasonable person to be convinced that the subcontractors had been paid, Presidential, by accepting the check and taking control of the funds, could be considered to have participated in the breach of trust. *See Restatement* § 297. It is a factual question whether Presidential made the inquiry, what response it received, and whether it acted reasonably under the circumstances. If Presidential did not act reasonably, then it would be liable to one with standing as a beneficiary under the Construction Trust Statute, because it participated in a breach of trust by PACS as trustee, by assuming control over the check from Phillips Way. Because these fact questions cannot be decided on a motion to dismiss, the circuit court erred in dismissing the amended complaint against Presidential on the grounds that Presidential cannot be liable under the Construction Trust Statute.

Appellees contend that as a matter of public policy, they should never face liability as trustees of funds that were earmarked to pay subcontractors. Specifically, they argue that banks are not in a position to monitor the business operations of their borrowers, and that "permitting the contractor to reclaim the funds [received from borrower] would have serious consequences for the availability of accounts receivable lending."

In support of their position, appellees rely on the seminal case of *Michelin Tires Ltd. v. First Nat'l Bank,* 666 F.2d 673

(1st Cir.1981), and four other cases following *Michelin,* all of which apply the Uniform Commercial Code. *See Phil Greer & Assocs., Inc. v. Continental Bank,* 614 F.Supp. 423 (E.D.Pa. 1985); *H. John Homan Co. v. Wilkes–Barre Iron and Wire Works,* 233 N.J.Super. 91, 558 A.2d 42 (App.Div.1989); *Lawson State Comm. College v. First Continental Leasing Corp.,* 529 So.2d 926 (Ala.1988); *Lydig Constr. v. Rainier Nat'l Bank,* 40 Wash.App. 141, 697 P.2d 1019 *rev. denied,* 103 Wash.2d 1042, 1985 WL 321166 (1995). In *Michelin Tires, supra,* Michelin entered into a contract with JCC "for the design and installation of a carbon black handling and storage system." *Michelin Tires,* 666 F.2d at 675. Under the terms of their agreement, Michelin paid JCC for work completed on the project and JCC was to pay various subcontractors with these proceeds. JCC also had an accounts receivable agreement with the First National Bank of Boston ("FNB"), and FNB "took a security interest in all JCC's accounts receivable and contract rights—including ... JCC's right to receive payments under its contract with Michelin." *Id.* After the construction contract was executed, JCC assigned its rights under the Michelin contract to FNB and requested payment be made directly to FNB.

During the course of the work, Michelin discovered that JCC had been making fraudulent declarations that no payment to subcontractors was due and had not been paying its subcontractors. JCC subsequently filed for bankruptcy protection and left a total indebtedness of over $500,000 (Canadian) on the project. Thereafter, Michelin sued FNB to recover the money it contended was earmarked to pay subcontractors. Specifically, Michelin filed suit under Massachusetts' version of the U.C.C., Mass. Gen. Laws Ann. Ch. 106, § 9–318(1)(a),[5] contending that "a bank taking an assignment of contract

---

5. Section 9–318 provided that:

(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale ... the rights of an assignee are subject to

(a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom.

rights as security for a loan would also receive ... a delegation of duties under the contract and the risk of being held liable on the contract in place of its borrower." *Id.* at 677.

The First Circuit disagreed, and held that section 9–318 did not create an affirmative right to bring suit. The court noted that FNB did not have notice of JCC's fraud and did not actively participate in the transaction. Additionally, the court was concerned that allowing a suit against an accounts receivable lender would have an adverse effect on the availability of accounts receivable financing.

> By making the bank a surety, not only will accounts receivable financing be discouraged, but transaction costs will undoubtedly increase for everyone. The case at hand provides a good example. In order to protect themselves, FNB would essentially be forced to undertake the precautionary measures that Michelin attempted to use, independent observation by an intermediary and sworn certifications by the assignor. FNB would have to supervise every construction site where its funds were involved to ensure performance and payment. We simply do not believe that the banks are best suited to monitor contract compliance. The party most interested in adequate performance would be the other contracting party, not the financier.... Costs for everyone thus increase, without any discernible benefit. It is also difficult to predict the full impact a contrary decision would have on the availability of accounts receivable financing in general.

*Id.* at 679–80.

The *Michelin Tires* holding was followed in *H. John Homan Co. v. Wilkes–Barre Iron and Wire Works*, 233 N.J.Super. 91, 558 A.2d 42 (App.Div.1989). In *Homan*, a general contractor brought suit under New Jersey's version of U.C.C. section 9–318 against its subcontractor's accounts receivable lender. Homan was required to reimburse its payment bond holder after the subcontractor failed to pay another subcontractor. The record indicated that neither the lender nor the general contractor "had been noticed either of [the lower level

subcontractor's] billings...." *Id.* at 43. The court held that the general contractor could not recover from the lender. Following *Michelin Tires,* the court reasoned that "while [under section 9–318] the account debtor can avoid payment to the assignee, he cannot obtain damages from the assignee." *Id.* at 44. Moreover, as in *Michelin Tires,* the court was concerned that holding the accounts receivable lender liable would have a detrimental effect on commercial lending.

> Obviously, if a *bona fide* lender without notice of defenses would be subject to disgorgement of payment after having credited the debt of the assignee and perhaps advancing additional funds to him, the viability of this mode of financing would be severely threatened since whatever stability and finality is now effected by payment to the assignee would be compromised.

*Id.* at 46.

Our holding in the instant case is neither inconsistent with the above cited cases, nor will it create an undue burden on accounts receivable lenders. *Michelin Tires, Homan* and the other cited cases were decided under section 9–318 of the U.C.C. No statute comparable to the Construction Trust Statute was applied. Thus, there was no trust relationship, and accordingly the accounts receivable lender had no knowledge of a trust relationship.

Moreover, we are not placing any undue burden on accounts receivable lenders to monitor the operations of its borrower. The Construction Trust Statute was enacted to protect the interests of down-the-line subcontractors. *See Ferguson Trenching,* 329 Md. at 174–75, 618 A.2d 735. An accounts receivable lender who receives money directly from a general contractor as payment for work performed by its borrower-subcontractor can easily take steps to affirm that the down-the-line subcontractors retained by the borrower-subcontractor have been paid. One measure of protection would be to obtain a certification under oath from the borrower-subcon-

tractor that all down-the-line subcontractors have been paid.[6] If under the circumstances, the lender had relied on that certificate, and its reliance was reasonable, the lender would be relieved from liability for its borrower's breach of trust. For us to allow a subcontractor to escape the requirements of the Construction Trust Statute, however, merely by directing payment of its accounts receivable to its lender would permit—and perhaps invite—lenders and borrower-subcontractors to "write checks around" the statute. That would undercut the clear purpose of the Construction Trust Statute.

### 2. Liability Of Individual Trustees

■ Although appellant made the same allegations against the individual appellees as it did against Presidential regarding their knowledge of the trust and PACS' breach thereof, we do not hold a cause of action is stated against these individuals. Appellant relies on section 9–202 of the Construction Trust Statute to reach the individual appellees. This section provides:

> Any officer, director, or managing agent of any contractor or subcontractor, who knowingly retains or uses the moneys held in trust under § 9–201 of this subtitle, or any part thereof, for any purpose other than to pay those subcontractors for whom the moneys are held in trust, shall be personally liable to any person damaged by the action.

Liability under this statute is predicated upon the individual's status as an officer, director, or managing agent of a "contractor or subcontractor." As we discussed in section II, the cause of action stated against Presidential arises not because Presidential is a "contractor or subcontractor" as defined in the Construction Trust Statute, but rather because Presidential is alleged to have participated in a breach of trust by PACS, who was a subcontractor, and therefore a trustee under the statute. Section 9–202 does not encompass the individual directors, officers, or managing agents of an "involuntary trustee" under these circumstances.

---

6. This step was taken in *Michelin Tires,* but the certification was fraudulent.

## III. Appellees' Waiver, Estoppel, And Standing Arguments Were Not Raised Below, And Will Not Be Addressed On Appeal

Appellees argue that Phillips Way waived any right to seek payment from Presidential, and is estopped from seeking such payment because it made checks jointly payable to Presidential and PACS. It also argues that Phillips Way has no standing to sue under the Construction Trust Statute because it is not a subcontractor whom the statute is designed to protect. None of these issues were raised by appellees in their Motion to Dismiss, and they were not the basis for the circuit court's ruling below. Accordingly, we will not address these issues in this appeal. *See* Md. Rule 8–131(a).

JUDGMENT REVERSED AS TO PRESIDENTIAL FINANCIAL CORPORATION OF THE CHESAPEAKE. JUDGMENT AFFIRMED AS TO RICHARD SINCLAIR, NICOLE IMHOFF, AND AMY EADS. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN PRESIDENTIAL FINANCIAL CORPORATION OF THE CHESAPEAKE AND PHILLIPS WAY, INC.