12 A.3d 153

John MENEFEE, et al.

v.

STATE of Maryland.

No. 37, Sept. Term, 2010.

Court of Appeals of Maryland.

Jan. 24, 2011.

Christopher T. Nace (Barry J. Nace and Jonathan B. Nace of Paulson & Nace, PLLC, Washington, D.C.), on brief, for appellants.

Bradley J. Neitzel, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

This case presents the opportunity to reflect on the unique governmental relationship between the State of Maryland (the State) and the Montgomery County Department of Health and Human Services (DHHS).[1] John Menefee ("Menefee"), on his

---

1. Montgomery County's equivalent of a local department of social services is known as the Montgomery County Department of Health and

behalf and for his son, John Damien Menefee, appeals from the judgment of the Circuit Court for Montgomery County— dismissing the suit the Menefees filed against the State— which reasoned that the State was not a proper party to the civil suit for damages based on alleged tortious conduct by DHHS employees. Specifically, Menefee alleged that two employees of the Montgomery County DHHS and/or Child Protective Services ("CPS") [2] negligently failed to investigate Menefee's claims regarding abuse suffered by his son and the boy's mother, Sheila Menefee (divorced from Menefee), who was murdered ultimately in the presence of John Damien, by her boyfriend. It was this failure, the Menefees claim, that was the proximate and actual cause of John Damien's Post-traumatic Stress Syndrome (PTSD),[3] which developed assert-edly as a result of direct child abuse by the boyfriend and witnessing his mother's murder.

We hold, for reasons to be explained more fully *infra*, that the State is a proper party to the present litigation, because: (1) pursuant to the State Government Article of the Maryland Code, in considering the Montgomery County DHHS as a "state unit," and its employees as "state personnel," the Legislature intended for the State to waive sovereign and governmental immunity, and assume liability for negligence arising from the administration of social service programming under Title 3, Subtitle 4 of the Human Services Article, *see* Maryland Code (1984, 2009 Repl.Vol.), State Government Arti-cle, § 12–101(a)(7), (b); [4] and (2) the State funds and main-

---

Human Services. *See* COMAR 07.01.03.02 (2010) (" 'Local depart-ment' means the local department of social services in a county or Baltimore City, and the Montgomery County Department of Health and Human Services.").

**2.** It appears that "Child Protective Services" is a subsidiary of "Child Welfare Services." *See* Child Welfare Services Home Page, http://www. montgomerycountymd.gov/hhstmpl.asp?url=/content/hhs/childwelfare/ about.asp (last visited 13 December 2010). For purposes of this opin-ion, we use the Menefees' version, "Child Protective Services."

**3.** *See infra* note 7.

**4.** Unless otherwise provided, all statutory references are to Maryland Code (1984, 2009 Repl.Vol.), State Government Article.

tains a degree of oversight and control over the Montgomery County DHHS for providing state services to Montgomery County residents. *See* Md.Code (2007), Human Services Art., §§ 3–403, 3–405. Accordingly, we vacate the judgment of the Circuit Court for Montgomery County and remand to that court to consider the remaining, unaddressed arguments advanced by the State in its motion to dismiss.

## FACTS [5] AND LEGAL PROCEEDINGS

As a result of earlier divorce proceedings, Menefee and Sheila Menefee (Sheila) shared joint legal and physical custody of their only child, John Damien. On 13 March 2004, Menefee met Sheila to exchange custody of John Damien and, while changing the boy's diaper, noticed bruises on the child's back and buttocks. He flagged down a police officer, who instructed him to take John Damien to Holy Cross Hospital.

Thereafter, CPS and/or DHHS were called. The agency determined that the bruising was several days old and, therefore, had been caused some time before Menefee picked up John Damien from Sheila. The case was referred ultimately to W. Don Thorne and LaVoyce Reed, a social worker, both employed by CPS.[6] Apparently, Thorne and Reed concluded that no determination could be made as to the source of the abuse or what would be the most appropriate way to protect John Damien prospectively. Thorne allegedly directed Mene-

---

**5.** Because the question before us involves the purely legal question of whether the State of Maryland is a proper party to the present litigation, the alleged facts of the alleged torts are immaterial largely. We include them, however, merely for background and context purposes. The facts as stated are gleaned from Menefee's complaint because this case was disposed of by way of a motion to dismiss. *See Phillips Way, Inc. v. Presidential Fin. Corp. of the Chesapeake,* 137 Md.App. 209, 212–13, 768 A.2d 94, 96 (2001) ("Because this appeal is from the grant of a motion to dismiss, all of the recited facts are taken from the allegations in the ... complaint.").

**6.** We assume this to be the case. In the Menefees' complaint, they state merely that "the case was referred to W. Don Thorne of CPS and social worker LaVoyce Reed." The State's motion to dismiss called Thorne and Reed "caseworkers."

fee and Sheila to participate in a parenting program and decided to leave the investigation open, in order to interview additional witnesses. Menefee contends that Thorne and Reed conducted no further investigation, in fact, and the case was deemed closed sometime between mid-March and mid-May 2004.

According to Menefee, he became aware at some point of the violent nature of Sheila's boyfriend, Ruben Diaz. Menefee apparently reported to CPS and/or DHHS on several occasions that he suspected Diaz to be the source of the physical and mental abuse suffered not only by John Damien, but Sheila as well, even telling CPS that Sheila told him that Diaz had cut her arm with a knife. Menefee reports that none of these claims were investigated or reported to other relevant authorities by CPS or DHHS.

On 6 September 2004, following an altercation which resulted in the grant of a temporary restraining order in favor of Sheila against Diaz, Diaz broke into Sheila's home and stabbed her to death. When the police arrived, they found John Damien—then two years of age—in the room with Diaz and his now-deceased mother. On 23 October 2007, the boy was diagnosed with PTSD,[7] at the age of five.

Pursuant to State Government § 12–106, Menefee and John Damien, through counsel, submitted, on 25 August 2008, a written claim to Nancy K. Kopp, Maryland State Treasurer.[8]

---

**7.** Posttraumatic Stress Disorder is classified as an anxiety disorder, involving

the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or *witnessing an event that involves death,* injury, or threat to the physical integrity of another person. . . .

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. text revision) (2000) (DSM–IV–TR) (emphasis added).

**8.** Section 12–106(b)(1) provides, in pertinent part, that "[a] claimant may not institute an action under this subtitle unless: (1) the claimant

On 22 September 2008, a claims adjuster from Treasurer Kopp's office notified the Menefees' counsel that, "[s]ince your claim was not filed within the 1 year period, the claim may not be considered." [9] Thereafter, on 4 March 2009, Menefee filed a four-count complaint against the State of Maryland in the Circuit Court for Montgomery County, alleging negligence, negligence per se, gross negligence, and negligent infliction of emotional distress.[10] Generally, Menefee claimed that the State, through Thorne, Reed, and CPS/DHHS; failed to perform a reasonable investigation of the first incident of suspected abuse (the bruising of John Damien); failed to find that the abuse occurred while in the physical custody of Sheila; and failed to investigate and/or report each of Menefee's complaints subsequent to the initial investigation; and, that such failures were the proximate and actual cause of John Damien's PTSD.

On 20 April 2009, the State filed a "Motion to Dismiss or for Summary Judgment," claiming, among other things, that (1) "the State of Maryland is not a proper party to this action." In its motion, the State relied first on language from Md.Code (2007), Human Servs. Art., § 3–402(a), which provides that,

———

submits a written claim to the Treasurer ... within 1 year after the injury to person or property that is the basis of the claim...."

**9.** The State's motion to dismiss in the present litigation also alleged that Menefees' claim was barred by § 12–106's requirement that a complaining party submit a written claim to the State Treasurer within one year. In the State's view, the harm occurred on 6 September 2004 (the date Sheila was killed in her son's presence), and, thus, a claim submitted to the Treasurer in August of 2008 was not timely. In response, the Menefees argue that the harm did not occur until 23 October 2007, when John Damien was diagnosed with Posttraumatic Stress Disorder. Because the issue relating to the limitations period for submitting a claim to the Treasurer was not briefed by either party, it is not, at present, before this Court. *See Navarro–Monzo v. Washington Adventist Hosp.*, 380 Md. 195, 200 n. 3, 844 A.2d 406, 409 n. 3 (2004) ("Because that issue was not raised or briefed by the parties, we shall address the issue that *was* raised and reserve the [other] question for another time.").

**10.** Menefee dismissed later the counts alleging gross negligence and negligent infliction of emotional distress.

"[i]n Montgomery County, the Montgomery County Government shall administer State social service ... programs that in other counties are administered by a local department. ..." Further, the State relied on State Government § 12–103.2(b), which provides that "a tort claim [11] shall be considered, defended, settled, and paid in the same manner as any other claim covered by the Montgomery County Self–Insurance Fund." In response, Menefee argued that the State was a proper party to the litigation, considering that the Maryland Tort Claims Act ("MTCA") includes expressly an "employee of a county who is assigned to a local department of social services, including a Montgomery County employee" in the definition of "state personnel." *See* § 12–101(a)(7).

After hearing oral arguments, the Circuit Court granted the State's motion, explaining that "I think clearly the intent of the legislature was that in this particular instance, with this set of facts, that the proper party in this case would be Montgomery County, not the State of Maryland." Menefee noted a timely appeal to the Court of Special Appeals. On our initiative, we issued a writ of certiorari, *Menefee v. Montgomery County*, 415 Md. 38, 997 A.2d 789 (2010), before the intermediate appellate court decided the appeal. We consider here Appellants' question—which we have rephrased—whether the State of Maryland is a proper party to a suit alleging negligence and negligence per se stemming from the alleged acts (or lack thereof) of Montgomery County DHHS employees in administering social service programming under Title 3, Subtitle 4 of the Human Services Article.

## STANDARD OF REVIEW

 In reviewing the Circuit Court's grant of a motion to dismiss, "our task is confined to determining whether the trial court was legally correct in its decision to dismiss." *Washing-*

---

**11.** Section 12–103.2(a) defines "tort claim" as "a tort claim filed in State court against the Montgomery County government relating to the administration of a State program under Title 3, Subtitle 4 of the Human Services Article." *See infra* note 23.

*ton Suburban Sanitary Comm'n v. Phillips,* 413 Md. 606, 618, 994 A.2d 411, 418 (2010) (quoting *Debbas v. Nelson,* 389 Md. 364, 372, 885 A.2d 802, 807 (2005)); *see Fioretti v. Md. State Bd. of Dental Exam'rs,* 351 Md. 66, 71, 716 A.2d 258, 261 (1998); *Shenker v. Laureate Educ., Inc.,* 411 Md. 317, 334, 983 A.2d 408, 418 (2009) ("We review the grant of a motion to dismiss as a question of law."); *Price v. Upper Chesapeake Health Ventures, Inc.,* 192 Md.App. 695, 702, 995 A.2d 1054, 1058 (2010), *cert. denied,* 415 Md. 609, 4 A.3d 514 (2010).

## ANALYSIS

### I. What is Meant by a "Proper Party" Defendant?

It is well settled that "[t]he duty of this [C]ourt, as of every other judicial tribunal, is to decide actual controversies...." *Thom v. Cook,* 113 Md. 85, 88, 77 A. 120, 120 (1910) (quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293, 293 (1895)). Further, "[a] general principle of law is that for a court to have jurisdiction it must have before it a justiciable issue." *Harford County v. Schultz,* 280 Md. 77, 80, 371 A.2d 428, 429 (1977). In Maryland, a case is justiciable "when there are *interested parties* asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." *Reyes v. Prince George's County,* 281 Md. 279, 288, 380 A.2d 12, 17 (1977) (quoting 1 W. Anderson, *Actions for Declaratory Judgments* 67 (2d ed.1951)) (emphasis added). It stands to reason, then, that a court is not presented with an "actual controversy," and does not decide a "justiciable issue" when the named defendant is not a proper party in the action.

In other contexts, this Court has defined a "party" as "all persons who have a direct interest in the subject matter of the suit...." *Ugast v. LaFontaine,* 189 Md. 227, 232, 55 A.2d 705, 708 (1947). Further, in a tort action such as this, we think "[t]he defendant should be he ... who, by reason of the relation between him and the actual perpetrator has a liability in law cast upon him for the acts or omissions of the actual perpetrator." HARRY M. SACHS, JR., POE'S PLEADING AND PRAC-

TICE § 467 (6th ed.1970). Thus, the issue in the present case is whether the State has a "direct interest" in the litigation or whether it has assumed potentially "liability in law" for the asserted damage to John Damien.

## II. The Relationship Between the State of Maryland and the Montgomery County DHHS: Way Beyond "Just Dating"

Former Maryland Code (1957, 1995 Repl.Vol.), Article 88A § 13 provided for the creation of a local department of social services in each county and Baltimore City.[12] *See id.* ("The State Department shall create or continue in each county and Baltimore City a local department of social services to be known as such with the name of the county ... prefixed thereto."). Accordingly, before 1996, "[t]he Montgomery County Department of Social Services staff [were] State employees and [were] paid by the Department of Human Resources." [13] H.B. 669 (1996), Fiscal Note. The County, however, "[a]nticipating federal changes and wanting to improve the cost effective delivery of health and human services," sought to transfer administration of social-service programming from the State Department of Human Resources to the County government. H.B. 669 (1996), Fact Sheet; [14] *see Id.* (stating

---

12. Article 88A was repealed by Chapter 3, § 1 of the Acts of 2007. Former Art. 88A § 13 is found currently—albeit excepting Montgomery County—in Maryland Code (2007), Human Servs. Article, § 3–201, and, with the exception of excluding Montgomery County from its provisions, is without substantive change from the language of Art. 88A.

13. The director of the Montgomery County Department of Social Services, at the time H.B. 669 was being considered by the Legislature as an overhaul of the State's and DHHS's relationship, testified, however, that the State employees of the County department had received a "benefit supplement" (akin to a bonus) from the County, pursuant to a "dual merit system" agreement between the County and the State Department of Human Resources.

14. The County sought to consolidate four departments—(1) Department of Addiction, Victim and Mental Health Services; (2) Department of Family Resources; (3) local Department of Social Services; and (4) Department of Health—into one County agency. *See* H.B. 669 (1996), Fact Sheet.

that H.B. 669 "provides for the *administration* of Social Services ... programs by grant agreement between the Department of Human Resources (DHR) and Montgomery County Government ....") (emphasis added); Letter from Donald Klausmeyer, Administrator—Montgomery County Department of Social Services, to House Appropriations Committee (21 March 1996) (stating that "[e]mployees of MCDSS view themselves as part of the County workforce. Many connections with the State are seen as artificial, redundant, or unnecessary," and that "employees find it difficult and time consuming to work under two sets of personnel regulations: two timesheets, conflicting holiday schedules, overlapping health insurance coverage, differing rates for sick leave, etc."); Letter from United Way of the National Capital Area to House Appropriations Committee (21 March 1996) ("We have frequently pointed out the repetitive, time consuming, costly and unnecessary trips that applicants are required to endure to establish eligibility for service."). House Bill 669 of the 1996 Legislative Session, which (among other things) "transferr[ed] the duties of the ... local department of social services in Montgomery County to the Montgomery County government," Chapter 476 of the Acts of 1996, was the "result of extensive negotiations between the Montgomery County Government and the Department of Health and Mental Hygiene." Department of Health and Mental Hygiene, Position Letter, H.B. 669 (1996).

The House Committee on Appropriations's Floor Report regarding H.B. 669 (1996) explains further the impetus for the legislation:

> The request for a transfer of the administration of social services from the State to a county government is unprecedented.[15] Montgomery County is in the process of reorga-

---

15. Montgomery County is the first—and, to date, only—county to where the administration of its social service programs have been transferred from the State to county government. *See* Department of Health and Mental Hygiene, Position Letter, H.B. 669 (1996) ("Montgomery County is the first jurisdiction to attempt to alter the traditional structure of a local health department...."); Md.Code (2007), Human Services Art.,

nizing the administration and delivery of its health and human services. The reorganization is in response to anticipated federal changes along with the implementation of block grants. The County is combining four separate departments into a County Department of Health and Human Services. To make the consolidation work, Montgomery County has requested that House Bill 669 be passed to allow the Transfer of the ... Local Department of Social Services to county government.

One of the primary consequences of House Bill 669, then, was to effectuate the goal of: "State social service and public assistance programs administered by a local department shall be administered by the Montgomery County Government." Md.Code (1957, 1998 Repl.Vol.), Art. 88A § 13A(b)(1). In transferring administration of social service programs to the County, however, the Legislature made a number of changes—especially relevant to the present case—to the MTCA, currently codified at Maryland Code (1984, 2009 Repl. Vol.), State Government Article, §§ 12–101 *et seq.*

■ Section 12–104(a)(1)—part of the MTCA—provides, in pertinent part, that, subject to the Act's other provisions, "the immunity of the State and *of its units* is waived as to a tort action...." [16] (Emphasis added.) Despite this limited waiver of sovereign and governmental immunity, the Act explains that "*State personnel* shall have the immunity from liability," § 12–105, for suits "in courts of the State and from liability in

§ 3–201(a)(1) ("This subsection [providing for the creation of a local department of social services under the auspices of the State] does not apply in Montgomery County.").

**16.** Our colleagues on the intermediate appellate court described the function of the MTCA aptly: "Historically, the State of Maryland enjoyed immunity from tort liability for the acts of its employees but, by the enactment of the [MTCA], the State, through a limited waiver of sovereign or governmental immunity, provides a remedy for citizens injured by the negligent acts or omissions of state personnel acting within the scope of their public duties." *Pulliam v. Motor Vehicle Admin.*, 181 Md.App. 144, 154 n.2, 955 A.2d 843, 849 n.2 (2008) (internal citation omitted).

tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article...." Md.Code (1974, 2006 Repl.Vol.), Courts and Judicial Proceedings Art. § 5–522(b) (emphasis added); *see Barbre v. Pope,* 402 Md. 157, 175, 935 A.2d 699, 710 (2007) ("[T]he State does not waive its sovereign immunity for any tortious acts outside the scope of employment or when a 'state personnel' acts with malice or gross negligence."). Where "state personnel" are negligent, "the statute generally waives sovereign or governmental immunity and substitutes the liability of the State for the liability of the state employee committing the tort." *Lee v. Cline,* 384 Md. 245, 262, 863 A.2d 297, 307 (2004).

Of greater significance—at least for our purposes—is House Bill 669's effect on § 12–101, the definitional section of the MTCA. Specifically, § 12–101(a) includes in the definition of "state personnel" (for purposes of the MTCA), "an employee of a county who is assigned to a local department of social services, including a Montgomery County employee who carries out State programs administered under Title 3, Subtitle 4 of the Human Services Article." § 12–101(a)(7).[17] Further, § 12–101(b) provides that "a unit of the State government includes the Montgomery County government to the extent that Montgomery County administers a State program under Title 3, Subtitle 4 of the Human Services Article."

On the other hand, while the State, in the definitional sections of the MTCA, seems to embrace its relationship with the Montgomery County DHHS, it seems to divorce itself by *talaq*[18] from the County DHHS in another section of the

---

17. It is undisputed that Thorne and Reed—apparently employees of the Montgomery County CPS (or Child Welfare Services)—were employed to carry out State programs administered under Title 3, Subtitle 4 of the Human Services Article.

18. *See Aleem v. Aleem,* 404 Md. 404, 406 n. 1, 947 A.2d 489, 490 n. 1 (2008).

MTCA. That is, § 12–103.2—added to the MTCA by House Bill 669—provides, in pertinent part, that "[a] tort claim shall be considered, defended, settled, and paid in the same manner as any other claim covered by the Montgomery County Self–Insurance Fund," and that "[f]or tort claims, the duties, responsibilities, and liabilities of the [State] Treasurer ... shall be assumed by the Montgomery County Self–Insurance Fund." § 12–103.2(b), (d)(2). It is these "mixed signals" that serve as the basis for the legal dispute in the present case.

While the State was transitioning away from a state-affiliated local Department of Social Services, it did not relinquish complete control over provision of state services in the County. For one, as stated in the Fiscal Note to H.B. 669, "[t]he administration of State programs by Montgomery County Government will continue to be governed by State regulations." *See* COMAR 07.02.07 *et seq.* (2010). Section 3–401(1) of Maryland Code (2007), Human Services Article—added to what was then Article 88A by House Bill 669—provides that "the purpose of this subtitle is to provide better integrated, more efficient, and accountable human services delivery in Montgomery County *by the State* and county...." (Emphasis added.) Regarding funding of the programming now to be administered by the County, § 3–403 of Maryland Code (2007), Human Services Article—also added to the MTCA by House Bill 669—provides that

the Secretary shall enter into a grant agreement with the Montgomery County government for the administration in Montgomery County of programs administered in other counties by local departments .... [that shall] ... provide for payment to Montgomery County for the costs of administering State programs ... [,including] salaries, overhead, general liability coverage, workers' compensation, and employee benefits....

*Id.* § 3–403(a), (b)(1)(i). Finally, the State maintains a degree of oversight over the Montgomery County DHHS in its administration of the formerly state-run programs. *See id.* § 3–405 ("The Secretary and the County Executive of Montgomery County shall consult with each other at least every

other year to ensure that the objectives of the social service and public assistance programs . . . are consistent with the objectives of the State social service and public assistance programs."). With this considerable prologue in mind, we turn to the contentions in the present case.

## III. The Present Case

It is important first to restate the parties' contentions. Menefee argues primarily that the State is a proper party to the present litigation, considering that § 12–101 of the MTCA includes expressly (1) Montgomery County employees (who carry out State programs administered under Title 3, Subtitle 4 of the Human Services Article) within the definition of "state personnel"; and (2) Montgomery County (as an entity) within the definition of "state unit" (also subject to the aforementioned caveat). Thus, Menefee perceives that because the State, in the MTCA, waives its sovereign and governmental immunity and assumes liability when Montgomery County or its employees (carrying out State programs administered under Title 3, Subtitle 4 of the Human Services Article) are negligent, the State must be a proper party to the present litigation. This conclusion, he argues, is bolstered by the fact that the State funds, to an extent, and maintains oversight over the provision of state services transferred from the State to the County government. *See* Md.Code (2007), Human Servs. Art., §§ 3–403, 3–405.[19]

---

**19.** Menefee argues also that (according to his understanding) the necessary consequence of the State's argument—that "in order to be compensated for tortious acts of HHS personnel, Mr. Menefee was not permitted to take advantage of the MTCA's voluntary waiver of immunity, but was instead required to abide by the Local Government Tort Claims Act, and name Montgomery County as the defendant in the matter"—is "arbitrary and capricious and denies John Menefee's right to equal protection under the law as it requires John Menefee to comply with two notice provisions *only* because he lives in Montgomery County, as opposed to any other county in the State of Maryland." The State, in its brief, takes issue with the premise that Menefee would be forced to comply with two notice provisions, stating that "[w]ithout the amendments to the definitional provisions of the MTCA, the County department and its employees would fall under the Local Government Tort Claims Act [alone]." Because we dispose of this case on non-

The State relies primarily on § 12–103.2, which provides that any tort claims arising from Montgomery County's administration of those social services programs "shall be considered, defended, settled, and paid in the same manner as any other claim covered by the Montgomery County Self–Insurance Fund," and that "the duties, responsibilities, and liabilities of the [State] Treasurer under this subtitle shall be assumed by the Montgomery County Self–Insurance Fund." § 12–103.2(b), (d)(2). The State argues, then, that because § 12–103.2 "was enacted as part of a comprehensive shifting of responsibility from the State to the County," that the State "has no legal responsibility for these claims" is a compelled conclusion. In responding to the Menefees' argument vis á vis § 12–101, the State contends that Montgomery County and its employees are considered a "state unit" and "state personnel," respectively, so that, as part of the "shifting of responsibility for certain human services programs to Montgomery County, liability falls on the County on the terms set forth in the MTCA." Further, the State points out that even in § 12–101(a)(7)—the provision including Montgomery County personnel carrying out State programs administered under Title 3, Subtitle 4 of the Human Services Article as "state personnel"—that such County employees, while being "state personnel" for purposes of the MTCA, remain "Montgomery County employees in fact," considering § 12–101(a)(7) states that " 'state personnel' means . . . an *employee of a county* who is assigned to a local department of social services, including a *Montgomery County employee* . . . ." (Emphasis added). In effect, then, both the Menefees and the State hang their respective hats on different statutory hooks of the MTCA— § 12–101 for Menefee; § 12–103.2 for the State—and attempt to discredit the opposition's understanding of its respective hook.

---

constitutional grounds, we do not reach this claim, invoking the principle that "we will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground." *Parker v. State,* 408 Md. 428, 435, 970 A.2d 320, 324–25 (2009) (quoting *State v. Lancaster,* 332 Md. 385, 404 n. 13, 631 A.2d 453, 463 n. 13 (1993)).

■ We subscribe to Menefee's understanding of the complex relationship between the State of Maryland and the Montgomery County DHHS. We are not as persuaded by the fact that Montgomery County or its employees carrying out State programs administered under Title 3, Subtitle 4 of the Human Service Article are considered a "state unit" or "state personnel," as we are by the effects of such being included in the definitions. That is, the State waives immunity and assumes liability for the County and/or its employees (as they are a "state unit" and "state personnel," respectively) acting negligently when administering social-service programming under Title 3, Subtitle 4 of the Human Service Article. Keeping in mind that the important principle of statutory interpretation is to construe statutes in a manner that is not "absurd, illogical, or incompatible with common sense," *Lockshin v. Semsker*, 412 Md. 257, 276, 987 A.2d 18, 29 (2010); *see Taylor v. Mandel*, 402 Md. 109, 128–29, 935 A.2d 671, 682 (2007) ("[W]henever possible, an interpretation should be given to the statutory provisions which does not lead to absurd consequences."), we think construing the MTCA—a statutory scheme in which the State waives sovereign and governmental immunity and assumes liability for Montgomery County—such as to leave the State immune from suit (*i.e.* not a proper party) for the negligent acts of the County is "absurd, illogical, [and] incompatible with common sense."[20] *Lockshin*, 412 Md. at 276, 987 A.2d at 29. We think it would be inconsistent to say, on one hand, that the State has assumed liability for certain County employees, yet say, on the other hand, that it has no "direct interest" in the litigation. *See Ugast*, 189 Md. at 232, 55 A.2d at 708. This conclusion, as Menefee argues, is bolstered by the fact that the State funds to an extent and

---

**20.** Despite arguing that it is not a proper party to the present litigation, the State conceded, at oral argument before this Court, that, under the circumstances plead here, the State Treasurer is the proper official to whom the required written notice of claim under the MTCA should be sent, when suing Montgomery County or its employees. Requiring a claimant to submit a written notice of claim to the State when it could not sue the State ultimately is another absurd result that our construction will avoid.

maintains oversight over the services transferred from the State to the County government. *See* Md.Code (2007), Human Servs. Art., § 3–403(a), (b)(1)(i) ("[T]he Secretary shall enter into a grant agreement with the Montgomery County government for the administration in Montgomery County of programs administered in other counties by local departments .... [that shall] ... provide for payment to Montgomery County for the costs of administering State programs ... [,including] salaries, overhead, general liability coverage, workers' compensation, and employee benefits...."); *Id.* § 3–405 ("The Secretary and the County Executive of Montgomery County shall consult with each other at least every other year to ensure that the objectives of the social service ... programs administered by the Montgomery county government are consistent with the objectives of the State social service ... programs.").

To be sure, § 12–103.2(b) does provide that claims relating to Montgomery County's administration of a State program under Title 3, Subtitle 4 of the Human Services Article are to "be considered, defended, settled, and paid in the same manner as any other claim covered by the Montgomery County Self–Insurance Fund." [21] Nowhere in the statute, however, does it state that Montgomery County alone is the proper named party in a suit under these circumstances; or, stated differently, nowhere in the statute does it state that the State of Maryland is not a proper party to such a suit. [22] Thus, § 12–103.2 does not save the day for the State. Accordingly,

---

**21.** The Montgomery County Self–Insurance Fund was created to "compensate for injury to persons or damage to property resulting from negligence or other wrongful acts of the county's public officials...." Montgomery County Code § 20–37(a) (2009).

**22.** While it may seem, at first blush, peculiar that the State is a proper party to a suit for which it has no obligation to defend or pay directly any judgment flowing therefrom, such a scenario is not unprecedented. The County, in the present scenario, is akin to an insurance company under a comprehensive liability policy, which has the contractual duty to defend its insured and pay any judgments entered against the insured (that relate to its contractual relationship). The proper party to such lawsuits is usually the insured, not the insurance company.

we disagree with the State's contention that "the State has no *legal* responsibility for these claims." (Emphasis added.) It is this potential "legal responsibility" or "liability in law" for these claims that requires the conclusion that the State is a proper party defendant to the present litigation.[23]

We conclude that the General Assembly—in waiving sovereign and governmental immunity and assuming liability for certain acts of Montgomery County and its employees when administering social-service programming under Title 3, Subtitle 4 of the Human Service Article—did not intend to preclude the State from being a proper party to a lawsuit stemming from those services now performed by the Montgomery County DHHS. "If the General Assembly did not so intend, it can amend or repeal the statute." *Ali v. CIT Tech. Fin. Servs.*,

---

**23.** Menefee, in his brief, argued also:

> Even on its face the statute relied upon by Maryland is irrelevant. [Section] 12–103.2 defines "tort claim" as a "tort claim in State court against the Montgomery County Government." § 12.103.2(a). This is not a "tort claim filed in State court against the Montgomery County government." Instead, it is a tort claim filed in State court against the State of Maryland. This statute is inapplicable to the instant case. [Section] 12–103.2 simply states that *if* Montgomery County is a party, then this section applies.

As the State explained at oral argument before the Circuit Court, "the argument is here, you can get around 12–103.2 simply by not naming Montgomery County as the defendant" and that one "can just not name Montgomery County, and then I get out from under 12–103.2." We agree with the State on this point and refuse to give § 12–103.2 a reading that allows a plaintiff to circumvent its provisions by simply naming a party other than the County. If this were the case, and if we were to conclude that § 12–103.2 is irrelevant wholly to the present case merely because Menefee named the State as a party, it would necessitate a conclusion that Montgomery County would not be liable financially for any negligence, as § 12–103.2 provides. It is abundantly clear from House Bill 669 and its accompanying legislative history that the Legislature intended the County, through its Self–Insurance Fund, to be liable financially for any judgment flowing from the acts of the County or its employees administering social-service programming under Title 3, Subtitle 4 of the Human Services Article. Whether, and how, the County and State account for the County's costs for supplying a defense against Menefee's claims and satisfying any judgment (or settlement) that results, is more obviously a matter of negotiation for the grant application and funding process contemplated between the two tiers of government.

188 Md.App. 269, 287, 981 A.2d 759, 769 (2009), *aff'd,* 416 Md. 249, 6 A.3d 890 (2010). As explained *supra* at note 9, before the Circuit Court for Montgomery County, the State also argued in its motion to dismiss that Menefee had not met § 12–106's requirement that a complaining party submit a written notice of claim to the State Treasurer within one year. In granting the motion to dismiss on the issue of whether the State was a proper party, it did not address the notice of claim issue. Accordingly, we vacate the judgment of the Circuit Court for Montgomery County and remand to that court for further proceedings.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY VACATED. CASE REMANDED TO THAT COURT FOR PROCEEDINGS NOT INCONSIS-TENT WITH THIS OPINION. COSTS TO BE PAID BY THE STATE.**

Judge BATTAGLIA joins in the judgment only.